**PUBLIC SERVICE COMPANY OF COLORADO, Plaintiff,**

v.

**Cecil D. ANDRUS, individually and as Governor of the State of Idaho, Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**Cecil D. ANDRUS, in his official capacity as Governor of the State of Idaho; State of Idaho, Defendants.**

**Civ. Nos. 91–0035–S–HLR, 91–0054–S–HLR.**

United States District Court, D. Idaho.

June 28, 1993.

1486

P. Craig Storti, Albert P. Barker, Hawley, Troxell, Ennis·& Hawley, Boise, ID, David W. Kerber, Salie B. O'Malley, Kelly, Stansfield & O'Donnell, Denver, CO, for plaintiff Public Service Co. of CO.

Pauline H. Milius, David F. Shuey, U.S. Dept. of Justice, Environmental and Natural Resources Div., Gen. Litigation Section, Washington, DC, for plaintiff, counterdefendant U.S.

David R. Lombardi, Jeffrey C. Fereday, Givens Pursley Webb & Huntley, Larry Echohawk, Atty. Gen., State of ID, Clive J. Strong, Allan D. Brock, Deputies Atty. Gen., Office of Atty. Gen., Natural Resources Div., Boise, ID, for defendant Governor Cecil D. Andrus and State of ID.

## MEMORANDUM OPINION

RYAN, Senior District Judge.

### I. FACTS AND PROCEDURE

The above-entitled action began as a dispute between the plaintiffs, Public Service Company of Colorado and the United States of America, and the defendants, Governor Cecil D. Andrus and the State of Idaho (hereinafter collectively "Idaho"), over shipments of spent nuclear fuel from the Fort St. Vrain Nuclear Generating Station in Colorado to the Idaho National Engineering Laboratory ("INEL") for storage at INEL's Irradiated Fuel Storage Facility.

The United States Department of Energy ("DOE") conducted an environmental assessment ("EA") of the transportation of spent nuclear fuel from the Fort St. Vrain facility to INEL for storage at INEL. The EA was conducted pursuant to the dictates of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq. Based on the EA, DOE determined that the shipment of spent fuel from Fort St. Vrain to INEL for storage would have no significant impact on the quality of the human environment. Thus, DOE concluded that no formal environmental impact statement ("EIS") under NEPA was required for the shipments from Fort St. Vrain.

On April 22, 1991, Idaho filed an Amended Answer and Counterclaim against DOE.[1] The counterclaim filed by Idaho sought declaratory and injunctive relief for alleged violations of NEPA and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706, relating to the shipments from Fort St. Vrain. Specifically, Idaho alleged that the EA was seriously flawed, and that DOE's decision to proceed with the Fort St. Vrain shipments based on that EA, without further analysis in a formal EIS, was an abuse of discretion and in contravention of the clear dictates of NEPA.

In a related action,[2] DOE was directed to reopen the NEPA process on the Fort St. Vrain shipments to consider comments from the Shoshone–Bannock Tribe of Idaho. Consequently, on February 24, 1992, DOE filed a Motion for Stay in the present case. DOE

---

[1]. In a related case, *Idaho Department of Health and Welfare v. United States Department of Energy*, Civil No. 91–0423–E–EJL (D.Idaho Oct. 4, 1991), Idaho brought suit against DOE on the grounds that the shipments of nuclear waste from Fort St. Vrain into Idaho violated state air quality standards. The State sought to enjoin DOE from authorizing any further shipments until DOE obtained a state air quality permit. The Honorable Edward J. Lodge, United States District Judge for the District of Idaho, issued a preliminary injunction, ordering DOE to obtain the state permit. DOE appealed this decision, and the Ninth Circuit Court of Appeals vacated the injunction and remanded the case back to the district court. *See Idaho Dept. of Health & Welfare v. United States*, 959 F.2d 149, 153 (9th Cir.1992).

[2]. *Shoshone–Bannock Tribes v. DOE*, Civil No. 91–0436–E–EJL (D.Idaho, Nov. 1, 1991).

represented to the court in its motion that it intended to consider comments from the Shoshone–Bannock Tribe, as well as comments from Idaho, and then issue a revised EA in early May or June of 1992.[3] Therefore, DOE argued that the counterclaim filed by Idaho was moot.

On May 8, 1992, the court denied DOE's Motion for Stay on the grounds that the counterclaim filed by Idaho would be moot only if DOE issued a revised EA which concluded that the proposed shipments from Fort St. Vrain might significantly affect the quality of the environment, and that a formal EIS was necessary. In that order, the court also advised DOE that in its view DOE was required to analyze the Fort St. Vrain shipments in a comprehensive EIS which also analyzed and discussed all past and proposed shipments of nuclear waste to INEL from all other sources, as well as all proposals relating to the processing and storage of nuclear waste at INEL.

In addition, the court denied DOE's Motion for Stay, as well as its Motion to Limit Review to the Administrative Record and for Protective Order, filed on January 7, 1992, because in earlier proceedings DOE had made serious misrepresentations to the court. Specifically, DOE had represented that the storage facility at INEL was the *only* possible facility where the spent nuclear fuel from Fort St. Vrain could be stored. The court later learned (only through the efforts of Idaho to present all of the facts to the court) that Public Service Company had applied to the Nuclear Regulatory Commission ("NRC") in June of 1990, to build an *on-site storage facility at Fort St. Vrain.* The NRC authorized construction of the facility on February 1, 1991. Construction began immediately, and it was completed in October of 1991. In November of 1991, the NRC issued a license to Public Service Company to operate the storage facility for 20 years.

When the court learned of these developments, it was dismayed by DOE's apparent bad faith in its representations to the court. Consequently, the court was unmoved by DOE's promise of future compliance with NEPA. In addition, the court was wary of DOE's effort to limit review to the administrative record.

On July 29, 1992, Idaho filed a Motion for Summary Judgment on its counterclaim, and on September 17, 1992, DOE filed a cross-motion for summary judgment. DOE moved for summary judgment on the grounds that it had filed a notice of intent to prepare an EIS addressing the Fort St. Vrain shipments.[4] Thus, DOE again argued that the case was moot. Idaho then filed a Motion for Leave to File an Amended Counterclaim on October 1, 1992. Idaho filed this motion in order to expand the scope of its counterclaim and to broaden its request for injunctive relief. The court granted the motion to amend on December 2, 1992.

In its amended counterclaim, Idaho seeks a declaratory judgment that DOE must analyze, in a comprehensive environmental impact statement, all major federal actions involving the receipt, processing, and storage of spent nuclear fuel at INEL. Idaho also seeks a declaration that DOE must study, develop, and describe all appropriate alternatives to the receipt, processing, and storage of spent nuclear fuel at INEL. Idaho also seeks an injunction against further receipt, processing, and storage of spent nuclear fuel at INEL until such an EIS is completed.

By virtue of the new amended counterclaim, there are now five categories of spent nuclear fuel at issue. The categories are as follows: (1) the spent nuclear fuel from Fort St. Vrain; (2) spent fuel from the nuclear powered ships and submarines of the United States Navy, brought to INEL under the auspices of the Naval Nuclear Propulsion Program; (3) spent fuel generated by research reactors from approximately 33 colleges and universities in the United States; (4) spent fuel from other DOE facilities; and

---

3. The court notes that there is no evidence that DOE in fact followed through on this promise.

4. The notice was published in the Federal Register in October of 1992. *See* Notice of Intent to Prepare an Environmental Impact Statement;

for Environmental Restoration and Waste Management Activities at the Idaho National Engineering Laboratory, 57 Fed.Reg. 45773 (Oct. 5, 1992).

(5) spent fuel from foreign reactors, pursuant to the "Off-site Fuels" program.

Idaho complains that there has never been proper NEPA analysis of the shipment, receipt, processing, and storage of spent nuclear fuel at INEL from any of these sources. Consequently, Idaho wants DOE to do a comprehensive, site-wide EIS addressing all future shipments from all of these sources, as well as DOE's proposals to expand and/or reconfigure storage facilities at the INEL and to develop and implement new technologies for processing spent fuels at INEL.

Both Idaho and DOE have renewed their motions for summary judgment. These motions have been fully briefed and a hearing was held on May 6, 1993. Therefore, these motions are now ripe for decision.

## II. ANALYSIS

### A. The Summary Judgment Standard

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The United States Supreme Court has made it clear that under Rule 56, summary judgment is required if the non-moving party fails to make a showing sufficient to establish the existence of an element which is essential to its case and upon which it will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If the non-moving party fails to make such a showing on any essential element of its case, "there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning

an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323, 106 S.Ct. at 2552.[5]

Under Rule 56 it is clear that an issue, in order to preclude entry of summary judgment, must be both "material" and "genuine." An issue is "material" if it affects the outcome of the litigation. An issue is "genuine" when there is "sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial," Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir.1975) (quoting First Nat'l Bank v. Cities Serv. Co., Inc., 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)), or when the "evidence is such that a reasonable jury could return a verdict for the non-moving party," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986). The Ninth Circuit cases are in accord. See, for example, British Motor Car Distrib., Ltd. v. San Francisco Automotive Industr. Welfare Fund, 882 F.2d 371 (9th Cir.1989).

In ruling on summary judgment motions, the court does not resolve conflicting evidence with respect to disputed material facts, nor does it make credibility determinations. T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626 (9th Cir. 1987). Moreover, all inferences must be drawn in a light most favorable to the non-moving party. Id. at 631. As the Ninth Circuit Court of Appeals has stated, "put another way, if a rational trier of fact might resolve the issue in favor of the non-moving party, summary judgment must be denied." Id.

In order to withstand a motion for summary judgment, the Ninth Circuit has held that a nonmoving party

(1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the bur-

---

**5.** See also Rule 56(e), Federal Rules of Civil Procedure, which provides in part:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

den of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*British Motor Car Distrib., Ltd. v. San Francisco Automotive Industr. Welfare Fund,* 882 F.2d 371, 374 (9th Cir.1989) (citation omitted). Moreover, the Ninth Circuit has held that where the moving party meets its initial burden of demonstrating the absence of any genuine issue of material fact, the nonmoving party must "produce '*specific facts showing* that there remains a genuine factual issue for trial' and ' "evidence significantly probative" as to any [material] fact claimed to be disputed.' " *Steckl v. Motorola, Inc.,* 703 F.2d 392, 393 (9th Cir.1983) (*citing Ruffin v. County of Los Angeles,* 607 F.2d 1276, 1280 (9th Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980)).

B. *Pending Motions for Summary Judgment*

1. Introduction.

In addressing the present cross-motions for summary judgment, the court will focus on the following issues: (1) whether Idaho has standing to pursue its claims as framed in the Amended Counterclaim; (2) whether or not the original EA done on the Fort St. Vrain shipments was flawed, and therefore, whether DOE violated the law by proceeding with the Fort St. Vrain shipments without preparing an EIS; (3) whether or not the categories of spent fuel which have been and continue to be brought to INEL pursuant to programs which began prior to the enactment of NEPA, nevertheless are required to be reviewed under NEPA, and thus, whether DOE is continuing to act in violation of the law by failing to perform required NEPA analyses of these activities; (4) whether or not this case is now moot because of representations and promises of compliance made by DOE; and (5) whether or not Idaho is entitled to injunctive relief.

The court will now address each of these issues in turn.

2. Standing.

■ Idaho seeks judicial review under NEPA and the APA of decisions by DOE relating to the shipment, receipt, processing, and storage of spent nuclear fuel at INEL. DOE argues that Idaho lacks standing to pursue its Amended Counterclaim because its claims are either premature, or its claims question agency actions or proposals which have not been the subject of final agency decisions.

■ The issue of standing in federal courts is first considered within the framework of Article III of the United States Constitution, which restricts judicial power to "cases" and "controversies." To satisfy standing under the case or controversy requirement, Idaho must show "(1) an actual threatened injury (2) traceable to the defendant's allegedly illegal conduct (3) which is likely to be redressed by the requested relief." *National Wildlife Fed'n v. Burford,* 871 F.2d 849, 852 (9th Cir.1989) (citations omitted). In the case at hand, the court finds that Idaho satisfies the minimum standing requirements under Article III. However, DOE argues that Idaho fails to satisfy the particular requirements under the APA.

■ The APA provides a right of judicial review to persons who have suffered a legal wrong because of the action of a federal agency, or to persons who are "adversely affected or aggrieved" by an agency action within the meaning of a relevant statute. 5 U.S.C. § 702. The relevant statute in this case is NEPA.

■ In analyzing standing under the APA, the first question to be asked is whether "the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise." *Association of Data Processing Serv. Org. v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). Then the analysis turns to whether the interest sought to be protected by an aggrieved party is within the zone of interests to be protected or regulated by the statute in question. *Id.* at 153, 90 S.Ct. at 830. Such interests can include aesthetic, conservational, and recre-

ational values. *Id.* See also *Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972). And finally, the aggrieved party's injury must be such that it can be redressed by the court.[6]

After careful review of the entire record in this matter, the court finds that Idaho has clearly alleged injury to the economy, natural resources, and health of the citizens of the State of Idaho caused or to be caused by DOE actions. The court further finds that these interests clearly fall within the zone of interests sought to be protected by Congress under NEPA. And, lastly, the claimed injury can be redressed by the court in the form of an order directing full compliance with NEPA. Therefore, the court concludes that Idaho has standing to bring the present action.

■ In order to provide DOE with a complete understanding of the court's analysis and conclusion, the court will now address some of these factors in detail. With respect to the injury requirement, the Ninth Circuit has declared that:

> Where, as here, Congress is the source of the purportedly violated legal obligation, we look to the statute [NEPA] to define the injury....
>
> From this perspective, the right claimed by appellants is, among others, the right to have agencies consider all reasonable alternatives before making a decision affecting the environment, as required by NEPA. The harm alleged by the ICL is thus one that Congress—by virtue of imposing NEPA's procedural requirements—has acknowledged. Indeed, as this court found in *Hodel*, because "NEPA is essentially a procedural statute designed to ensure that environmental issues are given proper consideration in the decisionmaking process,"

injury alleged to have occurred as a result of violating this procedural right confers standing.

*Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1514 (9th Cir.1992) (emphasis added) (citations omitted).[7] Thus, the court is satisfied that Idaho meets the injury requirement.

■ Next, as noted above, DOE argues that Idaho does not have standing because certain of its claims are not ripe. DOE also contends that some of the challenged actions have not been the subject of final agency decisions, and, therefore, no concrete action affecting its rights has yet been taken. In support of these arguments, DOE relies on *Lujan v. National Wildlife Federation*, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

In *Lujan*, the plaintiffs alleged that the Bureau of Land Management ("BLM"), in a "land withdrawal review program," had violated NEPA by failing to consider multiple uses for disputed lands and to prepare an appropriate EIS. The Supreme Court held that the plaintiffs lacked standing to challenge the "land withdrawal review program" because what they were challenging was not a definite, identifiable program rising to the level of "agency action" which could be challenged under the APA.

> That [program] is not an "agency action" within the meaning of § 702 [of the APA], much less a "final agency action" within the meaning of § 704. The term "land withdrawal review program" (which as far as we know is not derived from any authoritative text) does not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations. It is simply the

---

6. *See also, Benally v. Hodel*, 940 F.2d 1194 (9th Cir.1991):

> "[I]n order to meet the standing requirement of section 702, 'the interest sought to be protected by the complainant [must] arguably [be] within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.' " ... The plaintiff must have been injured in fact by the action he seeks to have reviewed.... Moreover, the plaintiff's injury must be " 'redressable by the court.' "

> ... This test also satisfies the minimum standing requirements of article III of the Constitution.

*Id.* at 1198 (citations omitted).

7. *See also Friends of the Earth v. United States Navy*, 841 F.2d 927, 931 (9th Cir.1988): "This court has long recognized that failure to follow procedures designed to ensure that the environmental consequences of a project are adequately evaluated is a sufficient injury in fact to support standing." (citation omitted).

name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required by the FLPMA [Federal Land Policy and Management Act]. It is no more an identifiable "agency action"— much less a "final agency action"—than a "weapons procurement program" of the Department of Defense or a "drug interdiction program" of the Drug Enforcement Administration. As the District Court explained, the "land withdrawal review program" extends to, currently at least, "1250 or so individual classification terminations and withdrawal revocations."

*Lujan v. National Wildlife Fed'n,* 497 U.S. at 890, 110 S.Ct. at 3189 (citation omitted).

Upon review of the *Lujan* case and the arguments made by DOE, the court finds that DOE's reliance on *Lujan* is inappropriate. The analysis and holding in *Lujan* have no application to the facts at hand. All of the DOE actions challenged by Idaho have been individually identified and specifically described by Idaho. In addition, the court finds that all of the challenged actions have been the subject of a final agency decision, or are of sufficient finality that DOE itself refers to them as "proposals" (such as the reconfiguration and expansion of spent fuel storage facilities at INEL), and their implementation is sufficiently imminent that Idaho is justified in challenging them at this time. The court finds this to be especially true in light of the obvious, varied, and serious violations of NEPA by DOE in connection with the receipt and handling of nuclear waste at INEL which are discussed in this decision.

█ DOE does not dispute that it plans to expand the Expended Core Facility at INEL. This expansion is intended to accommodate the expected significant increase in the number and volume of shipments of spent fuel to INEL under the Naval Nuclear Propulsion Program. DOE also does not dispute that it intends to reconfigure and thereby expand the Fuel Storage Area at the Flourinal Storage Building at INEL. Again, this proposed action is necessary to accommodate the ongoing accumulation of nuclear waste at INEL from the various sources described above. The record shows that the storage capacity of this facility may be exceeded within as little as two years. Clearly DOE's failure to give these proposals [8] the required "hard look" under NEPA can be challenged by Idaho through the APA.

█ Furthermore, DOE cannot argue that the claims by Idaho relating to spent nuclear fuel from the Navy, colleges and universities, and other DOE sites are either premature or relate to contemplated agency actions which have not been the subject of final agency decisions. As DOE points out, the original DOE decisions to begin bringing spent fuel from these sources were made many years ago. It is also undisputed that none of these shipments and related activities have ever been studied under NEPA.

Similarly, the Fort St. Vrain shipments have certainly been the subject of a final agency decision, and DOE now admits that these shipments must be the subject of a full EIS under NEPA before they may resume. Also, in December of 1992, DOE announced that it intends to renew its policy of receiving spent fuel from foreign sources (the so-called "Offsite Fuels" proposal). This announcement is certainly a sufficiently final decision for purposes of standing, particularly since Idaho is concerned that this program has never been properly reviewed under NEPA. In fact, DOE now acknowledges that the original EA and finding of no significant impact on the "Offsite Fuels" policy have

---

8. The court notes that the regulations promulgated by the Council on Environmental Quality ("CEQ"), which have been adopted by DOE, define "proposal" as follows:

"Proposal" exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the ef-

fects can be meaningfully evaluated. Preparation of an environmental impact statement on a proposal should be timed ... so that the final statement may be completed in time for the statement to be included in any recommendation or report on the proposal. A proposal may exist in fact as well as by agency declaration that one exists.

40 C.F.R. § 1508.23 (1992).

been strongly criticized, and it also concedes that this policy must undergo additional NEPA review. Therefore, in light of these facts and DOE admissions, the court finds that Idaho clearly has standing to pursue the claims raised in its Amended Counterclaim.

3. The adequacy of the original EA on the Fort St. Vrain shipments.

· ■ From 1980 to 1986, DOE received and stored three segments of spent nuclear fuel from the Fort St. Vrain Generating Station in Colorado. The three segments contained 726 blocks of spent nuclear fuel. In 1989, Public Service Company of Colorado informed DOE that, pursuant to a 1965 contract with the Atomic Energy Commission (DOE's predecessor), it intended to send six more segments, totaling 1482 blocks, of spent fuel from Fort St. Vrain to INEL. The 1482 blocks would require 247 truck shipments over a two-year period. In total, 300 metric tons of spent nuclear fuel from Fort St. Vrain have been or are proposed to be shipped to and stored at INEL.

When Public Service Company threatened legal action if DOE refused to honor the 1965 contract, DOE attempted to justify the shipment of the spent fuel to INEL on the grounds that it would be reprocessed there into highly-enriched uranium. However, the court notes that none of the Fort St. Vrain spent fuel brought to INEL has ever been reprocessed, and DOE has announced that it now does not intend to reprocess the Fort St. Vrain spent fuel.[9]

Conceding that the proposal to ship this large volume of nuclear waste to INEL constituted a "major federal action," DOE retained an independent contractor, Ecology and Environment, Inc., to prepare an EA.

DOE gave Ecology and Environment, Inc., very little time to complete the EA. In addition, prior to final completion of the EA, DOE directed Ecology and Environment, Inc., to prepare a statement finding that the proposal would have no significant impact. Pursuant to DOE's instructions, Ecology and Environment, Inc., prepared the EA and a finding of no significant impact ("FONSI"), whereupon DOE resumed the shipments. As noted above, Idaho challenges the adequacy of the EA, and DOE's decision to proceed with the Fort St. Vrain proposal without preparing an EIS.

When NEPA was enacted, Congress declared a broad national commitment to protect and promote environmental quality. See 42 U.S.C. § 4331. NEPA is a procedural statute designed to ensure that federal agencies strive to implement the policies of the Act in all major federal programs. This is accomplished through mandatory procedures which require, among other things, the preparation of a detailed environmental impact statement for "major Federal actions significantly affecting the quality of the human environment...." 42 U.S.C.S. § 4332(2)(C) (Law.Co-op.1989). In deciding whether the preparation of an EIS is necessary, an agency first conducts an EA. If the EA establishes that the proposed action will have "no significant impact on the environment," the agency need not prepare an EIS.

■ An agency's determination that a proposal will have no significant impact on the environment and that no EIS is necessary is a substantive decision. Such decisions are traditionally committed to the sound discretion of the agency. *Town of Orangetown v. Gorsuch*, 718 F.2d 29, 34 (2d Cir.1983), *cert. denied*, 465 U.S. 1099, 104

---

9. Idaho has submitted an internal DOE memorandum which suggests that DOE never intended to reprocess the fuel, but simply used that as an excuse to send it to INEL for indefinite storage. The memorandum was written by Victor Stello, Jr., Deputy Assistant Secretary for Facilities, Defense Programs, and was directed to the Assistant Secretary for Nuclear Energy on the subject of the proposed additional Fort St. Vrain shipments to INEL.

In his memorandum, Mr. Stello stated that he would order the necessary modifications at INEL to accommodate the Fort St. Vrain shipments.

However, he stated that Defense Programs "has no programmatic interest in the use of material from the reprocessing of fuel from civilian reactor programs and does not wish to participate in the reprocessing and ultimate disposition of those materials." Brock Aff., filed July 29, 1992, Ex. 11 (Mem. of Victor Stello, Jr.) at 1. Mr. Stello went on to state that "[w]e do not believe it is in our interest to become involved with R & D [research and development] or the design of facilities to process fuel from civilian reactors for any purpose." *Id.* Ex. 11 at 2.

S.Ct. 1592, 80 L.Ed.2d 124 (1984). However, the APA empowers the court "to hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.S. § 706(2)(A) (Law.Co-op.1989). *See also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971).

■ CEQ regulations provide federal agencies with specific factors to be considered in determining whether a proposed action must be studied in an EIS. The court finds the following factors to be of particular significance in the case at hand:

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

* * * * * *

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

40 C.F.R. § 1508.27(2), (3), (4), (5) and (7) (1992). The presence of one or more of these factors should result in an agency decision to prepare an EIS. *See LaFlamme v. FERC*, 852 F.2d 389, 398 (9th Cir.1988).

The Ninth Circuit Court of Appeals has declared that an agency's determination that an EIS is not necessary for a particular project should not be reversed unless that decision is unreasonable. *See The Steamboaters v. FERC*, 759 F.2d 1382, 1392 (9th Cir.

1985); *Foundation for North Am. Wild Sheep v. United States Dept. of Agr.*, 681 F.2d 1172, 1177 (9th Cir.1982). In addition, the Ninth Circuit has held that "[t]he standard for determining whether to prepare an EIS is whether 'the plaintiff has alleged facts which, if true, show that the proposed project *may* significantly degrade some human environmental factor.'" *The Steamboaters v. FERC*, 759 F.2d at 1392 (*quoting Columbia Basin Land Protection Ass'n v. Schlesinger*, 643 F.2d 585, 597 (9th Cir.1981)). In explaining this standard, the Ninth Circuit has declared that "[t]he plaintiff need not show that significant effects *will in fact occur*, but if the plaintiff raises substantial questions whether a project may have a significant effect, an EIS *must* be prepared." *Id.* at 1392 (*quoting Foundation for North Am. Wild Sheep v. United States Dep't of Agric.*, 681 F.2d at 1178).

■ In reviewing an agency decision, the court must ensure that the agency has complied "with the 'procedural duties' mandated by NEPA ... while still assuring *compliance with the substantive purposes of [NEPA].*" *Town of Orangetown v. Gorsuch*, 718 F.2d at 34 (*citing Kleppe v. Sierra Club*, 427 U.S. 390, 406 & n. 15, 96 S.Ct. 2718, 2728 & n. 15, 49 L.Ed.2d 576 (1976)) (emphasis added). However, it is important to note that it is not the function of this court to direct a particular substantive outcome, or to substitute its judgment for that of the agency. *See Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980); *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978).

Neither the statute [NEPA] nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions.... The only role for a court is to insure that the agency has taken a "hard look" at environmental consequences; it cannot "interject itself within the area of discretion of the executive as to the choice of the action to be taken."

*Kleppe v. Sierra Club,* 427 U.S. 390, 410, n. 21, 96 S.Ct. 2718, 2730, n. 21, 49 L.Ed.2d 576 (1976) (citations omitted).

■ In spite of the limitations on judicial review, the court is not required to accept DOE's conclusory statements in the EA, particularly where those statements form the basis of an EA which appears to be either obviously inadequate or a bad faith analysis of the expected environmental consequences of the Fort St. Vrain proposal. The court may look beyond DOE's recitations that it considered all relevant facts and/or arguments in reaching its finding of no significant impact.

> An "agency cannot ... avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment." *Lower Alloways Creek Tp. v. Public Service Electric and Gas Co.,* 687 F.2d 732, 741 (3d Cir.1982) The agency must supply a convincing statement of reasons why potential effects are insignificant.

*The Steamboaters v. FERC,* 759 F.2d at 1393.

Idaho has made a strong showing that serious shortcomings exist in the EA. Furthermore, after a careful and thorough review of the entire record in this matter, the court finds that DOE has not provided a convincing statement of reasons why potential effects are insignificant. On the contrary, the EA and the record before the court establish that DOE conducted a superficial and result-oriented analysis of many key aspects of the proposal. DOE also relied on outdated reports and studies in drawing many of its conclusions.[10]

DOE's responses to Idaho's interrogatories in many respects show that DOE had very little basis to support its finding of no significant impact. Those responses also show that DOE had no basis for its assertion in the EA that storing the spent fuel at the Fort St. Vrain facility would be much more expensive and environmentally hazardous than at INEL.

The record further shows that DOE paid only cursory attention to potential risks associated with transportation of the spent fuel from the Fort St. Vrain facility to INEL. The proposal would involve approximately 250 round trips by truck at a rate of 10 per week. Idaho has presented evidence that there are more potential risks associated with transporting the waste by truck rather than by rail. The option of using rail transportation was not discussed in the EA, pointing to DOE's failure to consider reasonable alternatives as required by NEPA. Furthermore, much of DOE's analysis of transportation risks focused on "incident-free" shipments. In light of the significant number of shipments, the court believes that DOE should have more carefully considered the potential effects of an accident in transport. Idaho has also presented evidence that DOE will not be able to use the shipping casks that are presently available to transport the Fort St. Vrain spent fuel. In fact, DOE now admits that new casks will have to be designed. Furthermore, Idaho has shown that several experts question the integrity of the casks that had been used, as well as the methods and standards for certifying the suitability of the casks for use. None of these points was discussed in the EA.

Idaho has also raised substantial questions regarding the adequacy of DOE's analysis of many of the risks associated with handling and storing the spent fuel at INEL, including the potential impacts on the employees at INEL and the surrounding population, as well as the possible harm to natural resources such as the Snake River aquifer which lies below INEL and is a major source of irrigation and drinking water for the State of Idaho. DOE also failed to give adequate consideration to the cumulative impacts of the proposal in conjunction with the shipment and storage of all of the other nuclear waste at INEL.

---

10. As an example, the court notes that DOE concedes that no study assessing the adequacy or effectiveness of the filtering and ventilation systems of the Irradiated Fuels Facility has been done for over eight years.

Another example is the fact that the EA used a 1977 standard for maximum radiation exposure for employees when a more stringent standard was established in 1990.

The court further finds that DOE did not adequately address the fact that it may be forced to store the spent fuel at INEL a great deal longer than anticipated if a permanent geological repository does not become available as planned. Failure to consider this possibility could prove to be a grave oversight given the fact that certain INEL storage facilities are already nearly filled to capacity, are nearing the end of their useful lives, and/or have experienced corrosion and other problems which bring their continued use into question.

Perhaps the most telling evidence of the inadequacy of the EA comes from Ecology and Environment, Inc., DOE's own independent contractor hired to prepare the EA. Ecology and Environment prepared a declaration finding no significant impact as instructed by DOE. However, Ecology and Environment did not do so without reservation. On the contrary, Ecology and Environment expressed *grave* reservations to DOE about the scope and adequacy of the EA, as well as the finding of no significant impact.

In a letter to DOE dated February 16, 1990, Ecology and Environment, Inc., informed DOE that it had conducted an internal review of the EA and the FONSI, and expressed its concerns to DOE.

As part of the internal review of the working draft, E & E [Ecology & Environment, Inc.] conducted an internal peer review of the document, requesting input from several senior E & E managers experienced in environmental assessments on controversial projects likely to be subjected to significant public scrutiny. This review yielded several substantive observations and recommendations that could not be addressed within the *abbreviated two week time-frame allowed for preparation of the draft report.* Some of these comments reflect opinions regarding the level of supporting detail and scope. They also, in some cases, reflect our *inability to obtain, review, or verify available data* with appropriate contact agencies (outside the INEL complex), other organizations, or reference documents. Within a very restricted time period, we feel that the activity as proposed is a *substantial* activity and

its overall significance under the terms of NEPA *can only be determined by a more indepth analysis.*

Brock Aff. filed July 29, 1992, Ex. 12 (Letter of Robert C. Peel to DOE, dated Feb. 16, 1990) at 1 (emphasis added). Thus, DOE was aware at that time that Ecology and Environment, Inc., seriously questioned the validity of the EA and the finding of no significant impact and recommended further analysis.

The court believes that the comments generated by the internal review of the EA by Ecology and Environment, Inc., reveal a great deal about the adequacy of the EA, DOE's knowledge, and the reasonableness of DOE's decision to resume the Fort St. Vrain shipments based on that EA. Therefore, the court will now set forth most of these comments verbatim.

(1) The *scope* of the EA is *so narrowly defined* that some *significant issues* (e.g. transportation, final disposition of the fuel, and relocation of the Rover and Peach Bottom fuels) *are not addressed with sufficient depth.* The cumulative impacts section should include a more detailed analysis of fuel transportation to the INEL and the final disposition of the Fort St. Vrain fuel. A joint NEPA document/assessment among PSC, NRC, and DOE should be considered.

(2) The *narrow focus on fuel "receipt and storage" amounts to a segmented approach to the potential environmental impacts associated with this project.* There is no question that a federal action (receipt and storage of spent FSV fuel) that requires other federal actions with potential environmental impacts (e.g., transportation and construction of additional spent fuel storage facilities at the ICPP) *should* be evaluated in the first EA/EIS.... *To do otherwise suggests not only segmentation, but also a proposal that has not been fully thought out.... It is questionable that the proposed approach will withstand scrutiny; there are several court cases holding a segmented approach to be inconsistent with the purposes of NEPA....*

(3) To the extent certain subject areas are excluded from the scope of this document

(e.g. transportation, transfer of fuel from the IFSF, new facility construction or retrofit, etc.) *more extensive detail should be provided that will state why it is done this way. To ignore relevant impacts is not a good way to deal with these problems. Subject areas should be excluded for a plausible and explainable reason or fully addressed in a defensible manner* (e.g. review transport related incidents and accident probabilities; evaluate the cask and facility design; and evaluate fuel transfer from the IFSF).

\* \* \* \* \* \*

(5) There is *insufficient discussion* of low probability catastrophic events. The postulated abnormal occurrences (Section 5) are more informative if quantified in sufficient detail to clarify what human risks could result. *A more comprehensive and quantified examination of the possible effects (Table 5.3) and preventive measures is needed* to ensure that not only institutional/operational controls are in place, but also other features such as contingency planning, redesign, cell integrity examination and other preventive mechanisms are viable and considered.

(6) The *listing of agencies that we consulted is very brief because contact with persons outside the INEL was discouraged due to the time constraints.* In keeping with Secretarial Notice # 15–90 (February 5, 1990) *a more open process is recommended to finalize this EA as well as future EAs* . . . .

(7) Much of the documentation made available to support the EA is *more than 10 years old and may not be valid.* The latest Safety Analysis Report should be used as a reference document. *Older documents should be subject to an independent technical review to determine whether the building design criteria still meet current standards.*

\* \* \* \* \* \*

(9) *Risk analyses should be more rigorously performed* to determine the probable risks of various accident scenarios (abnormal occurrences). Following confirmation of accident scenarios and possible release rates of radionuclides (source terms), currently available and accepted models . . . should be used to recalculate potential exposure data, or at least to verify previous calculations on a spot check basis.

Estimates of routine air emissions should be developed for the proposed action. *The 1983 data provides only limited information and is not necessarily applicable to current and/or future operations.* Furthermore, the 1983 measurements relate to a storage area containing material with somewhat different characteristics and involving a waste inventory of only 65% of the total storage capacity.

(10) *The useful life of the IFSF needs to be more thoroughly addressed.* If retrofit or significant maintenance is required within a 30 year useful life then it is appropriate to address the planning and consequences in the EA.

Brock Aff. filed July 29, 1992, Ex. 12 (Peer Review Comments generated by Ecology & Environment, Inc., attach. to Peel Letter dated Feb. 16, 1990) (emphasis added).

Despite these serious reservations expressed by Ecology and Environment, Inc., DOE issued the EA and FONSI and proceeded with the shipments from Fort St. Vrain. At the very least, Idaho has raised substantial questions regarding whether the Fort St. Vrain proposal may have a significant impact on the environment. Furthermore, the court is persuaded that the EA on the Fort St. Vrain proposal was seriously flawed because it was based on insufficient or outdated data, and because it failed to consider adequately the cumulative impacts of the proposal and a reasonable range of alternatives.[11]

---

11. In addition to the specific problems mentioned above, the court notes that the EA failed to address the fact that the Fort St. Vrain spent fuel will have to be stored at INEL for a period of time beyond the useful life of the Irradiated Fuels Storage Facility, despite the fact that Ecology and Environment, Inc., advised DOE that this issue required further study. In addition, while DOE acknowledges that other spent fuel currently stored at the Irradiated Fuels Storage Facility will have to be moved to the Underground Storage Facility (CPP–749) in order to make room for the Fort St. Vrain spent fuel, the EA failed to address the fact that the dry wells in

Based on the preceding discussion and the court's detailed knowledge of the entire record in this matter, the court finds that DOE's decision to proceed with the Fort St. Vrain proposal without preparing an EIS was clearly arbitrary, capricious, and a violation of both the mandatory procedures and the substantive purposes of NEPA. Therefore, the court will order DOE to prepare an EIS.

■ The court recognizes that DOE now agrees that a full EIS must be prepared on the Fort St. Vrain proposal. In fact, at the hearing held on May 6, 1993, counsel for DOE conceded on the record that DOE *should* and *will* study and assess the cumulative effects of the shipment, receipt, processing, and storage of nuclear waste at INEL from *all* sources in a comprehensive sitewide EIS. Although counsel for DOE admitted that a comprehensive EIS must be prepared, she objected to the court entering an order to that effect on the grounds that DOE has not violated the law. Without a violation of the law, DOE argues that the court has no authority to enter such an order. However, the court finds that DOE has in fact violated NEPA, and the court will enter an appropriate order to remedy the violations.

The court notes that DOE's change of heart comes only after many months of vigorous litigation by DOE in this matter. The court has been continually surprised and dismayed by DOE's reluctance to perform full NEPA analyses of the actions questioned by Idaho in this litigation. DOE's strenuous opposition, and the tremendous effort and taxpayer expense associated with such opposition, does not seem an appropriate course for an agency charged with overseeing such important, yet hazardous activities. DOE simply does not seem to understand that this nation is depending on it to protect the health and safety of all Americans from the dangers associated with its activities. At the very minimum, DOE should always be will-

the underground facility are nearing the end of their 20–year design life. Furthermore, the most recent annual dry well atmosphere samples from the underground facility showed corrosion occurring in the dry wells, and the company managing the facility has expressed concerns about its ability to continue to store spent fuel there safely.

ing to consider thoroughly all of the potential impacts of its proposed actions.

### 4. Whether "ongoing" activities at INEL must be reviewed under NEPA.

■ In its briefing before the hearing on May 6, 1993, DOE argued that NEPA does not apply to the shipment, receipt, processing, and storage of spent nuclear fuel from the Navy, colleges and universities, and other DOE facilities because these activities began prior to the enactment of NEPA on January 1, 1970. DOE argues that NEPA only applies to proposals to change the status quo made after January 1, 1970. However, as noted above, DOE did another about-face at the hearing and admitted that it should and will study the cumulative effects of the shipment, receipt, processing, and storage of nuclear waste at INEL from *all* sources in a comprehensive site-wide EIS.

Nevertheless, in order to determine whether or not Idaho is entitled to the relief it requests, the court must address this issue raised by DOE in its briefs. The rationale behind DOE's argument is that NEPA is a procedural statute which requires government agencies to analyze the environmental effects of a proposed federal action *before* such action is taken. DOE relies on a number of cases in support of its position. *See Andrus v. Sierra Club,* 442 U.S. 347, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979); *Upper Snake River Chapter of Trout Unlimited v. Hodel,* 921 F.2d 232 (9th Cir.1990); *Burbank Anti–Noise Group v. Goldschmidt,* 623 F.2d 115 (9th Cir.1990); *City & County of San Francisco v. United States,* 615 F.2d 498 (9th Cir.1980); *Committee for Auto Responsibility v. Solomon,* 603 F.2d 992 (D.C.Cir.1979), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980); *Westside Property Owners v. Schlesinger,* 597 F.2d 1214 (9th Cir. 1979).

And lastly, without recent reliable data regarding the effectiveness of the Irradiated Fuels Storage Facility's filtering and ventilation systems, the EA failed to assess accurately the amount of radionuclides that may be vented into the outside air. Radionuclides are listed as hazardous pollutants under Section 112(b)(1) of the Clean Air Act, 42 U.S.C. § 7412(b)(1).

The court has reviewed these cases and finds that they are all either factually distinguishable or in fact provide this court with a basis for requiring DOE to review and analyze what it characterizes as "ongoing" activities not subject to NEPA. For example, in *Andrus v. Sierra Club*, 442 U.S. 347, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979), the Supreme Court explained that "if an agency program were to be expanded or revised in a manner that constituted major federal action significantly affecting the quality of the human environment, an EIS would have been required...." *Id.* at 362–63, 99 S.Ct. at 2343.

DOE relies most heavily on an appeal from this court, *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232 (9th Cir.1990), to support its argument. In *Upper Snake River*, the plaintiffs challenged the fact that the Bureau of Reclamation chose not to prepare an EIS before it periodically adjusted the flow of water from the Palisades Dam in southeastern Idaho. The plaintiffs were concerned about the effects of reduced flows on the fish population downstream.

Construction of the Palisades Dam was completed in 1956, and the dam has been operated continuously since that time. *Id.* at 234. The amount of water in the Snake River fluctuates a great deal each year, requiring the Bureau of Reclamation to adjust the flow from the dam accordingly. The Bureau's standard operating procedures governing water flow first went into effect in 1956.

In *Upper Snake River*, the district court acknowledged that the fluctuating flows, particularly very low flows, would have a negative impact on the fish population. However, the court held that managing such fluctuations is part of the routine and ongoing operation of the dam; therefore, decisions to alter flows are not subject to the EIS provisions of NEPA. The Ninth Circuit agreed that controlling the water flow from the dam constituted nothing more than the routine operation of a facility that had been designed and constructed long before NEPA became effective on January 1, 1970. *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d at 233.

 NEPA requires that the hard look at environmental consequences of major federal actions be done *before* such actions are taken. Nevertheless, if a project is significantly expanded or revised, an EIS may be required. This principle was enunciated by the Ninth Circuit in *Upper Snake River*. "Since NEPA does not apply retroactively ... an EIS cannot be required on the basis of the project's construction. However, if an ongoing project undergoes changes which themselves amount to 'major Federal actions,' the operating agency must prepare an EIS." *Id.* at 234. The Ninth Circuit went on to note that "where a proposed federal action would not change the status quo, an EIS is not necessary." *Id.* at 235. Thus, significant changes in programs rising to the level of major federal actions which have or will change the status quo must be studied under the procedures outlined in NEPA.

Idaho has clearly documented that the volume of nuclear waste being brought to INEL and the frequency of shipments are increasing dramatically under the existing or "ongoing" programs at INEL.[12] Idaho has also shown that not only is the amount of waste being brought to INEL increasing, but the waste is no longer being reprocessed for further use and is simply being brought there to be stored indefinitely.[13] This is a significant change in the status quo.

Furthermore, existing facilities at INEL are nearly filled to capacity and/or are nearing the end of their useful lives. Idaho has presented documents to the court which show that these facilities have had corrosion, environmental contamination, and other problems associated with the storage of waste which call their continued use into serious question. In addition, DOE is pro-

12. DOE concedes that the total amount of spent nuclear fuel to be brought to INEL over the next ten years will be more than double that of the previous decade.

13. In addition to announcing that the Fort St. Vrain spent fuel will not be reprocessed, DOE announced in April of 1992 that naval spent nuclear fuel will no longer be reprocessed into valuable forms of uranium, but will simply be inspected and stored at INEL indefinitely.

posing to expand the Expended Core Facility and to reconfigure the Fuel Storage Area ("FSA") of the Flourinal Storage Building where spent naval fuel is stored. Ecology and Environment, Inc., has also indicated that DOE will most likely have to build additional storage facilities in order to accommodate all of the waste DOE now wishes to bring to INEL.

And, finally, DOE recently announced its intention to develop and apply new technologies at INEL to reprocess the spent fuel into forms suitable for permanent storage in a geological repository. At the same time, DOE has declared that it will not conduct a NEPA review of this program until *after* the spent fuel has arrived at INEL. In light of all of these changes and new proposals, the court strongly believes that DOE must prepare a comprehensive, site-wide EIS addressing all nuclear waste activities at INEL. Certainly such an analysis would be in the public's best interest and would further the important substantive goals of NEPA.

■ Furthermore, because the court holds that DOE must study the Fort St. Vrain proposal in an EIS, it is clear that DOE must assess whether the Fort St. Vrain proposal would have a cumulatively significant impact on the environment when viewed in light of all of the other previous and proposed future shipments of nuclear waste (and all related activities) to INEL from the variety of sources outside Idaho. *See Kleppe v. Sierra Club,* 427 U.S. 390, 410, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976); *see also,* 40 C.F.R. §§ 1508.7 [14] and 1508.25.[15] Therefore, DOE should prepare a single, comprehensive EIS as suggested by Idaho.

The *Kleppe* case is particularly applicable to the case at hand. In *Kleppe,* environmental organizations challenged the Department of the Interior's issuance of a series of leases for coal mining in a particular region. The Supreme Court declared:

> [W]hen several proposals for coal-related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, *their environmental consequences must be considered together. Only through comprehensive consideration of pending proposals can the agency evaluate different courses of action.*

*Kleppe v. Sierra Club,* 427 U.S. at 410, 96 S.Ct. at 2730 (emphasis added). The Ninth Circuit has also expressly stated where an action is related to other actions which together may produce cumulative or synergistic environmental effects, NEPA requires that these actions be studied together in a comprehensive EIS. *See Sierra Club v. Penfold,* 857 F.2d 1307, 1321 (9th Cir.1988).

Idaho represents to the court that its present challenge was triggered in part by DOE's announcement that the spent fuel being brought to INEL would no longer be reprocessed, but would simply be brought to Idaho to be stored indefinitely. This announcement signaled a potentially significant change in the entire purpose of INEL, which for much of its history has served as an advanced research facility.

In light of the fact that DOE now wishes to bring in spent fuel from civilian reactors and from foreign reactors, it appears that DOE is quietly attempting to make INEL the nuclear waste repository for the United States and the rest of the world. By quietly, the court means that by characterizing all of its activities as "ongoing," by fractionalizing and segmenting its proposals, and by its strenuous opposition to the positions advanced by Idaho during the course of this

---

14. Title 40 C.F.R. § 1508.7 (1992) defines a cumulative impact as:

> [T]he impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

15. Title 40 C.F.R. § 1508.25 (1992) states:

> To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include: * * * *
> (2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.

litigation, DOE is seeking to evade NEPA review. While this court can certainly understand the critical need to find and develop appropriate sites for storing nuclear .waste, DOE must understand that the selection and use of such sites must be done in accordance with NEPA and all other applicable statutes and regulations.

Therefore, based on the preceding discussion, the record before the court, the recent pronouncements by the Ninth Circuit in *Upper Snake River*, and DOE's own admission at the hearing on May 6, 1993, the court finds that DOE must prepare a comprehensive, site-wide EIS addressing all nuclear waste activities at INEL. DOE shall review the more recent proposals, as well as what DOE characterizes as "ongoing" activities, challenged by Idaho in its Amended Counterclaim.

The reasons for the court's holding can be summarized as follows. First, because DOE has made and proposed significant expansions and revisions in existing programs involving the receipt and storage of nuclear waste at INEL, these changes must be addressed in an EIS. Second, because DOE must prepare an EIS on the Fort St. Vrain proposal and the "Offsite Fuels" proposal, DOE must analyze and discuss all of the other previous and proposed shipments from other sources, and all related activities [16] at INEL, in a single, comprehensive EIS. Such an EIS is necessary to insure that DOE discovers and considers the cumulative impacts of all of these shipments and activities on the environment surrounding INEL.

Even if DOE were not *technically* required to perform this comprehensive, site-wide EIS on nuclear waste activities at INEL, one would think that, rather than going through all of the effort and taxpayer expense involved in litigating this case, DOE would simply go ahead and prepare the EIS out of a sense of concern for the people, natural resources, and agricultural industry of the State of Idaho. Such callous disregard for the legitimate concerns raised on behalf of the citizens of Idaho is exactly the type of conduct which tarnishes the image of federal government agencies in the eyes of the people.

The court finds additional support for its ruling in the earlier Ninth Circuit case of *Jicarilla Apache Tribe v. Morton*, 471 F.2d 1275 (9th Cir.1973). In that case, the Ninth Circuit declared that:

> It is clear that NEPA applies to *all* major Federal actions taken subsequent to January 1, 1970, regardless of whether the project with which the particular major action is associated was initiated prior to the effective date of NEPA.... The fact that it is not practicable to reassess the basic course of action does not mean that an environmental impact statement need not be filed prior to a further major action taken pursuant to that basic course of action.... [W]hile it may be deemed too late to assess the project as a whole, further incremental major actions must be shaped so as to minimize adverse environmental consequences, and "to the maximum extent practicable," the § 102(2)(C) procedure [preparation of an environmental impact statement] must be complied with.... The focus must lie on the practicability of adherence to the requirements of § 102(2)(C) as regards *each* major federal action contemplated, not on the project as an entirety.

*Id.* at 1282–83.

5. *Mootness.*

■■■ In its briefing and in its statements made at the hearing, DOE argues that this case is moot because it intends to prepare an EIS on nuclear waste activities at INEL. Therefore, DOE argues that it is entitled to summary judgment in its favor on Idaho's Amended Counterclaim. The court is not

---

**16.** The related activities include the expansion and reconfiguration of the storage facilities at the INEL, as well as DOE's proposal to develop and apply new technologies at INEL to process spent nuclear fuel into forms suitable for permanent disposal in a geological repository. These proposals are "connected actions" within the meaning of 40 C.F.R. § 1508.25(a)(1). The court also notes that 40 C.F.R. § 1502.4(c)(3) (1992) provides that "new technologies, which if applied, could significantly affect the quality of the human environment" must be addressed in an environmental impact statement.

persuaded by DOE's argument for the following reasons.

First, the actions of DOE in the course of this litigation belie a finding of mootness. When this litigation began, DOE took the position that it was not necessary to prepare an EIS on the Fort St. Vrain proposal. It now admits that an EIS must be prepared. DOE also maintained that it was not necessary to prepare an EIS on the "Offsite Fuels" program, under which DOE plans to ship nuclear waste from foreign countries to INEL. DOE now agrees that an EIS should and will be prepared. DOE has also spent a great deal of time and effort arguing that "ongoing" waste activities at INEL need not be studied under NEPA, although it conceded at the hearing that it should and will do so. The court is of the opinion that DOE's position on these issues has changed only because of the pressure brought by Idaho in this litigation. Furthermore, DOE continues to argue that the court has no authority to enter an order directing DOE to prepare a comprehensive EIS because DOE has not violated the law. The court, as noted above, disagrees.

The court also notes that when DOE filed its Motion to Stay on February 24, 1992, it represented to the court that it intended to revisit the EA on the Fort St. Vrain proposal, conduct further study and/or consider additional comments from the public, and then issue a revised EA in early May or June of 1992. The court assumes that DOE intended to address the shortcomings in the EA identified by the private contractor, Ecology and Environment, Inc., who prepared the original EA. However, DOE never followed through on this promise.

In light of the NEPA violations identified by the court in this opinion, as well as DOE's conduct during the course of this litigation, the court is unmoved by DOE's promise of voluntary cessation of its unlawful conduct and the resulting argument that Idaho's Amended Counterclaim is moot. In *United States v. W.T. Grant Co.*, 345 U.S. 629, 73

S.Ct. 894, 97 L.Ed. 1303 (1953), the Supreme Court held that

> voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot.... The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion.... For to say that the case has become moot means that the defendant is entitled to a dismissal as a matter of right.... The courts have rightly refused to grant defendants such a powerful weapon against public law enforcement.

*Id.* at 632, 73 S.Ct. at 897 (citations and footnotes omitted).[17]

The Supreme Court went on to hold that a "case may nevertheless be moot if the defendant can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.' The burden is a heavy one." *Id.* at 633, 73 S.Ct. at 897 (footnote omitted).

The Ninth Circuit Court of Appeals has noted that the voluntary cessation exception to the mootness doctrine applies "generally in cases in which a type of judgment with continuing force, such as an injunction, is sought." *Armster v. United States Dist. Court*, 806 F.2d 1347, 1357 (9th Cir.1986). Such relief is sought in the case at hand. In addition, the court declared that:

> The ultimate question to be considered in determining whether the exception is applicable is the likelihood of recurrence of the challenged activity. Where there is a reasonable possibility that the unlawful conduct will recur, the mere cessation of that conduct will not render the challenged conduct immune from judicial scrutiny. The Supreme Court's "mootness cases ... have established a powerful presumption favoring adjudication" in these circumstances.

*Id.* at 1358–59 (citation and footnote omitted).

The Supreme Court has advised that when gauging the likelihood of recurrence, a par-

---

**17.** *See also Walling v. Helmerich & Payne*, 323 U.S. 37, 43, 65 S.Ct. 11, 14, 89 L.Ed. 29 (1944): "Voluntary discontinuance of an alleged illegal activity does not operate to remove a case from the ambit of judicial power."

ty's own statement that the illegal conduct will not recur is not sufficient. "Such a statement, standing alone, cannot suffice to satisfy the heavy burden of persuasion which we have held rests upon those in [the defendant's] shoes." *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968). All that DOE has offered to show the court that the present action is moot is its own statements that it will do the required NEPA analysis sought by Idaho.

Lastly, as noted above, DOE does not admit that it has violated NEPA. This fact further militates against a finding of mootness. "It has long been recognized that the likelihood of recurrence of challenged activity is more substantial when the cessation is not based upon a recognition of the initial illegality of that conduct." *Armster v. United States Dist. Court*, 806 F.2d at 1359 (footnote omitted).

In light of the preceding discussion regarding the history of this case, as well as the case law set forth above, the court concludes that this case is not moot. The court finds that DOE has not met its heavy burden of showing that there is no reasonable expectation that the NEPA violations will not recur, nor even that it will definitely follow through on its promises in the absence of a court order requiring it to do so.

### 6. Injunctive relief.

#### (a) *Introduction.*

In its Amended Counterclaim, Idaho seeks to enjoin DOE from receiving any type of spent nuclear fuel at INEL until it prepares a comprehensive site-wide EIS on all the spent fuel coming to INEL and all the related activities associated with the shipment, receipt, processing, and storage of that spent fuel. DOE argues that an injunction is not warranted because (1) there have been no violations of the law which would serve as the basis for entering an injunction; (2) Idaho cannot demonstrate irreparable injury if the shipments continue; and (3) there are no other facilities available to accept the spent nuclear fuel during the time the injunction is in effect. The court has already found that DOE has violated NEPA. Therefore, the court will focus on DOE's remaining two arguments.

#### (b) *Irreparable injury.*

The traditional bases for injunctive relief are irreparable injury and inadequacy of legal remedies. *See Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 542, 107 S.Ct. 1396, 1402, 94 L.Ed.2d 542 (1987). "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.*

The Ninth Circuit Court of Appeals has employed a presumption of irreparable injury in cases where federal agencies have failed to comply with the mandatory procedures of NEPA.

> Irreparable damage is *presumed* when an agency fails to evaluate thoroughly the environmental impact of a proposed action.... *Only in a rare circumstance may a court refuse to issue an injunction when it finds a NEPA violation.* Indeed, the policies underlying NEPA "weight the scales in favor of those seeking the suspension of all action until the Act's requirements are met...."

*Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1250 (9th Cir.1984) (citations and footnote omitted) (emphasis added). *See also, Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985): "Our cases repeatedly have held that, absent 'unusual circumstances,' an injunction is the appropriate remedy for a violation of NEPA's procedural requirements.[ ] ... Irreparable damage is presumed to flow from a failure properly to evaluate the environmental impact of a major federal action." *Id.* at 764 (citations and footnote omitted). Thus, under this formulation, Idaho is not required to show irreparable damage.

The Ninth Circuit also applied this approach in *Village of Gambell v. Hodel*, 774 F.2d 1414 (9th Cir.1985), an action brought under Section 810 of the Alaska National Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. § 3120. The Supreme Court reversed the Ninth Circuit's decision in *Village of Gambell*, holding that such a presumption runs contrary to traditional equitable principles involved in determining the

appropriateness of granting injunctive relief. Furthermore, the Court held that the presumption is unnecessary, because "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Production Co. v. Gambell*, 480 U.S. at 545, 107 S.Ct. at 1404.

In *Amoco*, the Supreme Court disagreed with the use of a presumption of irreparable damage in the context of ANILCA. However, it did not specifically address the use of such a presumption in the context of NEPA, a purely procedural statute which requires environmental analysis *before* major federal actions are taken or allowed to proceed further. Furthermore, the Court in *Amoco* clearly indicated that in most circumstances where environmental injury is threatened, the only meaningful remedy is an injunction pending full environmental analysis.

The Ninth Circuit has questioned the applicability of the *Amoco* decision in NEPA cases. *See Sierra Club v. United States Forest Serv.*, 843 F.2d 1190 (9th Cir.1988): "In analyzing the Alaska National Interest Lands Conservation Act (94 Stat. 2371, 16 U.S.C. § 3120) *not NEPA*, the Supreme Court in *Amoco* rejected a presumption of irreparable injury when an agency fails to evaluate thoroughly the environmental impact of a proposed action. . . ." *Id.* at 1195 (emphasis added).

In *Sierra Club v. Marsh*, 872 F.2d 497 (1st Cir.1989), the First Circuit held that because NEPA is a purely procedural statute, while ANILCA embodies substantive standards in addition to procedural requirements, the Supreme Court's decision in *Amoco* should not routinely control the decision of whether or not to institute an injunction in NEPA cases. *Id.* at 502–03. NEPA is a much different statute from ANILCA. NEPA requires only that its procedures be followed, while ANILCA also provides for substantive review of agency action.

■ It is critical in most cases that review under NEPA occur *before* any major action is taken or allowed to continue when challenged. Such review is intended to apprise the agency of all environmental consequences, and particularly the harmful consequences, of a proposed action. This review also requires the agency to develop and evaluate reasonable alternatives before its actions proceed so far that its decisions regarding the program become cast in stone. The more effort and resources that are put into a project, the less likely an agency is to abandon the project, or to change it in any significant manner, regardless of what the NEPA review reveals.

Based on the preceding discussion, it would appear that the presumption of irreparable damage employed by the Ninth Circuit in cases involving NEPA violations may still be used despite the Supreme Court's holding that such a presumption is inappropriate in the context of ANILCA. However, the court feels compelled to follow the approach taken by the Supreme Court in *Amoco*. In doing so, the court first notes that it may exercise its traditional equitable discretion in deciding whether an injunction should issue. *Amoco Production Co. v. Gambell*, 480 U.S. at 544–45, 107 S.Ct. at 1403–04. Next, although Idaho has shown statutory violations, it must also show a sufficient likelihood that irreparable injury may occur if the injunction is denied. Lastly, the court must weigh the competing harms in granting or denying the requested relief.

In the case at hand, the court finds, as forecast by the Supreme Court in *Amoco*, that the presumption of irreparable injury is unnecessary. Idaho has shown that the number and volume of shipments of spent nuclear fuel to INEL will increase dramatically under DOE's current proposals. DOE admits that there is some exposure to radiation in every incident-free shipment. Idaho concedes that the dose per shipment is below that permitted by law and cannot alone serve as grounds for an injunction. However, it is undisputed that the total amount of radiation exposure increases as the number of shipments increases, and it does not appear that DOE has calculated the risks from repeated exposures along the transportation route or routes. Both sides agree that the risk of an accident in transit increases as the number of

shipments increase. It is also undisputed that the environmental consequences of even a single accident could be devastating.[18]

Idaho has also raised serious questions regarding the integrity, operation, and capacity of the storage facilities at INEL should shipments continue while the challenged actions are reviewed. Idaho has filed a number of reports and letters generated by or for DOE which detail specific safety problems and incidents. For example, a report prepared by IT Corporation on behalf of DOE reveals that pools storing spent fuel in the Underwater Fuel Storage Facility at INEL are "not in compliance with current DOE Orders. Consequently, the ... pools are not an appropriate location for the long-term storage of spent fuel while a high-level waste repository is being developed." *See* Brock's Aff. Supp. Idaho's Not. of Filing Supplemental Exs., filed June 4, 1993, Ex. A (IT Corp.'s. *Spent Fuel Background Report,* Sept. 18, 1992, at 3–24). The underwater storage facility went into service in 1951 with a design life of 30 years. Its design life has already been exceeded by 12 years.

Another report focuses on the fact that the Underwater Fuel Storage Facility at INEL has no impermeable liner underneath the storage basins, no leak detection system, nor any ventilation or air conditioning systems in the basin area. *See id.,* Ex. B (Westinghouse Idaho Nuclear Company, Inc., *Nuclear Fuel Reprocessing Phaseout Plan for the Idaho Chemical Processing Plant,* Oct.1992, at 100–01). The report expresses concern over potential leakage through the basin walls into the environment. *Id.* Ex. B at 101. It also notes that "[r]ecent inspections have revealed gross corrosion of the fuel, baskets, and

yokes. The potential for a severe seismic event to cause a criticality has not been fully evaluated yet, but is a concern." *Id.* Based on these and other problems, the report recommended that use of the facility be terminated and the spent fuel moved elsewhere. However, because new spent fuel continues to arrive at INEL, taking up remaining available storage space as well as scarce labor and equipment resources at INEL, the transfer of fuel and closure of this facility cannot proceed as recommended. *Id.* at 101–02. This is exactly the sort of cumulative or related impact which DOE must study in a comprehensive EIS.

In a letter dated March 4, 1993, John C. Conway, Chairman of the Defense Nuclear Facilities Safety Board, advised DOE's Acting Assistant Secretary for Environmental Restoration and Waste Management, of the Board's safety concerns regarding the storage of nuclear waste at INEL. To summarize, the Board expressed concern over the following: (1) several "unusual occurrence" reports issued in 1992, arising from improper fuel storage configurations and degradation of a criticality safety barrier; (2) safety standards at INEL are set too low; (3) ineffective and/or inadequate inspection practices; (4) existing detection equipment in some storage pools is inadequate and probably would not recognize a criticality if one were to occur; (5) independent validation of criticality safety evaluations are not being done; and (6) the ability of the existing storage facilities to withstand seismic events. *See id.,* Ex. C (Conway Letter, Mar. 4, 1993).

In a report entitled *New Directions in Nuclear Safety Management and Organiza-*

---

18. In *Sierra Club v. Watkins,* 808 F.Supp. 852, 875–76 (D.C.1991), the district court held that the risks associated with transportation of spent nuclear fuel *alone* warranted the imposition of an injunction. That case also reveals another attempt by DOE to evade NEPA review.

　Five years ago, the Department of Energy attempted to import spent nuclear fuel rods from Taiwan through a West Coast port without filing the documentation required by NEPA. Once they were caught by an environmental group and enjoined by a prior lawsuit, the Department shifted its plans to an East Coast port and filed an EA which did not consider real alternatives. The Department

filed a second EA in 1988 that similarly did not consider real alternatives. The Department was sued once again and the plaintiff specifically identified a variety of perceived flaws in the EA. In 1991, the Department again filed an EA correcting some, but not all, of the problems.... While none of the parties and especially not this court wish to waste government time and resources, the Department must make another attempt to comply with the law. It is not this court's order, but rather it is the Department's failure to follow the requirements of NEPA that has forced this duplication of effort.

*Id.* at 876.

*tion,* DOE's independent Office of Nuclear Safety detailed significant safety violations and several dangerous incidents which have occurred in recent years at INEL. For example, on March 19, 1992, a radiation stream of 2 rem/hour was detected outside of one of the facilities at INEL. The report characterized this incident as a "near miss in the sense that prompt fatalities could have resulted from the manner in which the facility was being operated." *See id.,* Ex. D (*New Directions in Nuclear Safety Management and Organization,* Apr. 2, 1993, at 26).[19] The report went on to note that lack of proper management and inadequate implementation of correction measures resulted in a repeat incident at the same facility on June 17, 1992. *Id.,* Ex. D at 27.

After the incident on June 17, 1992, the Office of Nuclear Safety reviewed historical radiological survey records and discovered a surveillance report in August of 1991 which revealed several unexplained employee exposures to dangerous levels of radiation. The Office of Nuclear Safety stated that the DOE office in Idaho did not follow up on this surveillance report and line management failed to respond to the concerns until after the March 1992 incident. *Id.* at 27.

The Office of Nuclear Safety also expressed significant concerns over the Underwater Fuel Storage Basin at the Idaho Chemical Processing Plant. In particular, the Office noted that conditions at that facility have degraded to such an extent that "the potential for a criticality accident has increased significantly." *Id.* at 29. Particular problems cited in the report included corrosion of fuel storage devices, non-functioning safety devices, storage of spent fuel in unapproved locations, inadequate safety analyses based on inappropriate standards, and failure to follow facility operations procedures. *Id.*

On April 2, 1992, low level radioactive material was inadvertently released from the processing plant at INEL, resulting in radioactive flakes the size of quarters falling on 40 acres of land surrounding the facility. DOE sent notice of this incident to Idaho and the

Fort Hall Indian Reservation with a cover page erroneously stating, "This is a drill." *Id.* at 82. And, the Office of Nuclear Safety reported that on February 9, 1991, an explosion occurred at one of the processing facilities at INEL which spewed a mixture of highly enriched uranium and heated nitric acid onto three employees. *Id.* at 83. This facility remains closed because of explosion damage and high levels of contamination. Furthermore, the Office of Nuclear Safety concluded that the initial contractor investigation and the corrective actions taken by the Idaho office of DOE were inadequate. *Id.*

Other incidents documented by Idaho include the following. In October of 1991, casks in which spent fuel from Fort St. Vrain was transported to INEL were tested and found to be emitting radiation at a level dangerously close to the prescribed limit. A few days later an alarm went off in the Irradiated Fuels Storage Facility as a result of these emission levels. DOE's response was to disconnect the alarm, although DOE now maintains that the detection device was set too low.

DOE recently discovered that in one of the storage areas 25 highly radioactive fuel elements were stored adjacent to each other, and in the same area, corrosion caused a carbon steel hanger to fail which resulted in a bucket containing spent fuel to drop to the floor. These events occurring in the same area violated the "double contingency" rule (two independent, unlikely and concurrent changes must occur before an accidental criticality is possible). *See* Idaho's Reply Mem., filed Nov. 3, 1992, Ex. 3 (DOE *Abnormal Occurrence Report for Secretary Watkins*) at 1. In other words, these events came dangerously close to causing an accidental criticality or nuclear chain reaction at the facility.

Lastly, the court notes that the storage capacity of the facilities at INEL is nearly exhausted, while the number and volume of proposed shipments is increasing. Exceeding these capacities without the necessary

**19.** The report went on to state that "[t]o place these radiation levels [2 rem/hour] in perspective, the DOE Administrative Control Level established in the DOE Radiological Control Manual is 2 rem per year." *Id.*

expansions and reconfigurations now being proposed by DOE, which must be studied under NEPA, could lead to even more dangerous conditions at INEL.

On June 16, 1993, DOE filed the Declaration of Robert M. Stallman. Mr. Stallman is the Assistant Manager for Nuclear Programs in the Idaho Operations Office of DOE. In his affidavit, Mr. Stallman states that the incidents and safety concerns revealed in the documents filed by Idaho are irrelevant because they address storage facilities which will not receive any additional spent fuel, or because corrective measures have been or are being taken.

Despite DOE's desire to characterize serious safety concerns as irrelevant, the court finds that the documents are in fact relevant in light of the court's holding that DOE must thoroughly study all of the cumulative effects of the receipt and storage of spent nuclear fuel at INEL in a single, site-wide EIS. Furthermore, this latest affidavit shows DOE's persistence in downplaying risks [20] and promising corrective action. The record reveals that significant safety problems have arisen and continue to arise at INEL; that DOE has been advised of these problems; and that DOE has failed to take adequate remedial measures. In addition, the record shows that the risks of serious environmental contamination and loss of life increase as additional spent nuclear fuel is brought to INEL under these conditions.

■ In light of the specific risks and incidents identified by Idaho, the court finds that the threat of irreparable environmental injury is sufficiently likely that an injunction should issue.

#### (c) *Relative hardships.*

■ In addition to addressing the issue of irreparable injury, the court must weigh the relative hardships should injunctive relief be granted or denied. DOE argues that an injunction cannot be entered because there are no other facilities which can store the proposed shipments of spent nuclear fuel in the interim. While DOE represents that the waste slated for storage at INEL has nowhere else to go, this court is still dismayed and concerned by DOE's assertion that there was no other facility available to take the Fort St. Vrain nuclear waste except INEL, when it turned out that there was a facility *at the Fort St. Vrain site* which could take the waste. Consequently, the court is unable to place much credence in DOE's bald assertions that there are no alternative, short-term storage facilities in the country able to accept the waste destined for INEL while the required NEPA review takes place.

Idaho has suggested a variety of locations and means of storage to accommodate the nuclear waste during the injunction period. DOE's only response is that none of these suggestions is workable. DOE has not even attempted to provide the court with possible alternative storage sites or plans. In its briefing, DOE simply stands by its claim that there are no other facilities available. However, Richard Guida, Associate Director of Regulatory Affairs for the Naval Nuclear Propulsion Program, conceded in his deposition that the spent fuel to be removed from nuclear-powered ships that are currently undergoing and are scheduled to undergo overhauls and refuelings (and/or defuelings and deactivations) in the near future could be stored in containers at the respective shipyards. Such storage would take place during the time it takes to complete the NEPA process.[21]

DOE complains that the Naval Nuclear Propulsion Program will be interrupted if an injunction is entered because the spent fuel from nuclear powered ships and submarines will not be analyzed for research purposes at INEL within the usual time frames. Idaho has established that there is a substantial

---

**20.** In minimizing the problems and risks associated with the activities being challenged by Idaho, the court is concerned that DOE is relying on the analyses and data contained in the EA prepared for the Fort St. Vrain proposal. DOE's independent contractor, Ecology and Environment, Inc., characterized the studies and analyses in the Fort St. Vrain EA as being more than 10 years old and of questionable validity.

**21.** *See* Mem. Supp. Idaho's Renewed Mot. Summ. J., filed Mar. 5, 1993, Ex. 32 (Guida Dep. at 162–63); *see also, id.,* Ex. 31 (DOE's Resps. Andrus' Third Set of Interrogs., at 3–4).

backlog of spent naval fuel at INEL waiting to be examined, providing the program with sufficient materials for study during much of the time an injunction would be in effect. DOE responds with the rather convenient argument that spent naval fuel is not necessarily analyzed on a "first-in, first-analyzed" basis. Idaho has also shown that there is no pressing need to examine the spent naval fuel which would be brought to INEL in the coming months because the new fuels for the ships to be refueled over the next two to three years have already been designed. *See* Idaho's Renewed Mot. Summ. J., filed Mar. 5, 1993, Ex. 31 (DOE's Resps. to Andrus' Third Set of Interrogs. at 8–9).

Idaho has submitted the affidavit of Robert Cook, an expert presently active in overseeing the storage of nuclear waste at the Hanford, Washington, site. Prior to his present position, Mr. Cook was employed by the Nuclear Regulatory Commission from 1980 to 1988, and he worked for what is now known as the Naval Nuclear Propulsion Program from 1963 to 1980. Upon review of the record in this matter, Mr. Cook notes that the new fuels to be installed in nuclear-powered ships as part of the ongoing and presently planned refuelings have already been fully researched and designed. Cook Aff., filed Apr. 5, 1993, at 5. In his affidavit, Mr. Cook also details the alternative storage options and locations available to DOE should an injunction be entered. And, Mr. Cook concludes:

> In my opinion, the U.S. Naval Nuclear Propulsion Program would not be disrupted in any appreciable fashion if the Court were to enjoin the Department of Energy (DOE) from receiving and storing any more spent naval fuel at the Idaho National Engineering Laboratory (INEL) until it complies with the National Environmental Policy Act (NEPA).

*Id.*

Based upon a careful review of the entire record in this matter, the court is satisfied that through rescheduling of ship refuelings, the use of alternative storage sites, and the use of alternative storage measures, the Naval Nuclear Propulsion Program will not be seriously disrupted if an injunction against the receipt of any additional nuclear waste at INEL is entered during the time it takes DOE to comply with NEPA. Despite DOE's protestations that there are no other facilities available, the court is confident that if an injunction is entered, DOE will use its substantial expertise and resources to make the necessary arrangements. Furthermore, DOE must realize that its own failure to comply with the law, as well as its unwillingness to plan for the possibility of an injunction being entered in this action, are responsible for the difficulties it now faces.

On the other side of the ledger, Idaho has raised serious questions regarding the nuclear waste operations at INEL. Idaho has also brought to light serious violations of the law on the part of DOE. Given the circumstances of this case and the very nature of nuclear waste, the court is of the opinion that the continued shipment, receipt, processing, and storage of additional nuclear waste at INEL, under current conditions and without NEPA review, make the threat of irreparable injury sufficiently likely to warrant the imposition of an injunction. Furthermore, the court finds that the threat of irreparable injury, the safety problems identified by Idaho, and DOE's record of disregard for the law and lack of candor with the court, when weighed against the potential inconvenience and additional costs caused by enjoining additional shipments of nuclear waste pending completion of the NEPA process, tip the balance of harms in favor of issuing an injunction in the interest of safety and to protect the environment.

### (d) *Public interest.*

■ The court must also weigh and consider the public interest in deciding whether or not to grant the injunction requested by Idaho. *See Sierra Club v. Penfold,* 857 F.2d 1307, 1318 (9th Cir.1988). This dispute has not arisen because of a lack of clarity or other shortcoming of the law. Rather it is simply the result of DOE's refusal to comply with the law. This court agrees with the district court in *Seattle Audubon Soc'y v. Evans,* 771 F.Supp. 1081 (W.D.Wash.1991) that "[t]his invokes a public interest of the highest order: the interest in having government officials act in accordance with law."

*Id.* at 1096 (*citing Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928)). Therefore, the court concludes that the public interest favors imposition of an injunction in this matter.

#### (e) *Conclusion.*

DOE represents to the court that it will not ship any more nuclear waste from Fort St. Vrain to INEL until an EIS is completed and a decision is made to resume such shipments based on that EIS. DOE further represents that it will not resume shipments of spent fuel from foreign reactors until that proposal has been through a thorough NEPA analysis. In light of the past NEPA violations recounted above, the court will hold DOE to these promises.

The court further notes that DOE has made no strenuous argument against an injunction prohibiting additional shipments from colleges and universities and from other DOE facilities until the NEPA process is completed. The record shows that the proposed shipments from these sources involve relatively small amounts of spent fuel, and the court finds that other accommodations can reasonably be made.

Therefore, based on the promises made by DOE and the discussion set forth above, the court will enjoin DOE from transporting, receiving, processing, or storing any additional nuclear waste of any kind, from any source, at INEL until it complies fully with the mandatory procedural requirements of NEPA and the specific terms of this decision.

#### C. *Summary*

The court has carefully and thoroughly reviewed the entire record in this matter, including the affidavits, exhibits, and memoranda submitted by the parties, as well as the cases cited therein. Upon completion of this review, the court finds that there are no disputed questions of material fact yet to be resolved which would preclude the court from granting summary judgment. Therefore, based on the court's review of the record, the court concludes that Idaho is entitled to judgment in its favor as a matter of law.

To summarize, the court holds that Idaho has standing to pursue its claims as framed in the Amended Counterclaim and that this action is not moot. The court also holds that the original EA done on the Fort St. Vrain shipments was flawed, and therefore, DOE violated NEPA by proceeding with the Fort St. Vrain shipments without preparing an EIS. The court further concludes that the shipment and storage of spent fuel, which has been and continues to be brought to INEL pursuant to programs which began prior to the enactment of NEPA, as well as the proposals to accommodate these shipments, are required to be reviewed under NEPA because of substantial changes and proposed changes in these programs which themselves amount to major federal programs. Consequently, the court finds that DOE's refusal to study the environmental consequences of these significant changes violates the mandatory procedural requirements of NEPA.

In light of these violations of NEPA, the court will direct DOE to analyze, in a comprehensive environmental impact statement, all major federal actions involving the transportation, receipt, processing, and storage of spent nuclear fuel at INEL, including the cumulative impacts of such activities. DOE must also study, develop, and describe all appropriate alternatives to the receipt, processing, and storage of spent nuclear fuel at INEL, including the alternative of "no action" and the alternative of storing the spent nuclear fuel at sites other than INEL.

In accordance with the court's findings, DOE shall be enjoined from any further shipment, receipt, processing, and storage of spent nuclear fuel at INEL until the EIS is completed. DOE shall also be enjoined from proceeding with any of its proposed activities relating to the receipt, processing, and storage of spent nuclear fuel at INEL until the EIS is completed.

And, lastly, the court shall exercise its discretion and retain jurisdiction over this case for the purpose of hearing and resolving any dispute between Idaho and DOE regarding the adequacy of the final EIS. The court notes that the Ninth Circuit has held that the district court may retain jurisdiction over

actions in order to review the adequacy of an EIS. *See Sierra Club v. Penfold,* 857 F.2d 1307, 1322 (9th Cir.1988).

The court will enter a separate order embodying the substantive determinations set forth in this Memorandum Opinion.

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT, INJUNCTION AND ADMINISTRATIVELY TERMINATING ACTION

Based on the Memorandum Opinion entered this date, and the court being fully advised in the premises;

IT IS HEREBY ORDERED that Idaho's Renewed Motion for Summary Judgment, filed March 5, 1993, should be, and is hereby, GRANTED.

IT IS FURTHER ORDERED that the Renewed Motion for Summary Judgment, filed by the United States of America on behalf of the Department of Energy on March 19, 1993, should be, and is hereby, DENIED.

Pursuant to the findings and conclusions set forth in the Memorandum Opinion which accompanies this order, THE COURT HEREBY DECLARES that, in light of the substantial questions raised by the State of Idaho regarding both the recent proposals and the significant changes in existing programs involving the transportation, receipt, processing, and storage of spent nuclear fuel at the Idaho National Engineering Laboratory, these proposals and significant changes in programs may have a significant effect on the quality of the human environment.

THE COURT FURTHER DECLARES that by failing to perform the mandatory analyses of the environmental effects of these proposals and significant changes in programs, the Department of Energy has violated the National Environmental Policy Act and the regulations promulgated by the Council on Environmental Quality. Furthermore, the failure to assess the environmental consequences of these proposals and significant changes is arbitrary, capricious, and contrary to law.

IT IS FURTHER ORDERED that the Department of Energy shall prepare a comprehensive, site-wide environmental impact statement, pursuant to Section 102(2)(c) of the National Environmental Policy Act, 42 U.S.C. § 4332(2)(c), and the regulations promulgated by the Council on Environmental Quality, that discloses and evaluates the following:

A. The direct and indirect environmental effects of all major federal actions involving the transportation, receipt, processing, and storage of spent nuclear fuel at the Idaho National Engineering Laboratory;

B. How each major federal action involving the transportation, receipt, processing, and storage of spent nuclear fuel at the Idaho National Engineering Laboratory, in conjunction with all related or connected actions, as well as past, present, and reasonably foreseeable future actions, cumulatively or synergistically impact the quality of the human environment; and

C. A reasonable range of alternatives to each major federal action involving the transportation, receipt, processing, and storage of spent nuclear fuel at the Idaho National Engineering Laboratory—including the alternative of abandoning those actions (i.e., the "no-action" alternative) and the alternative of transporting, receiving, processing, and storing spent nuclear fuel at sites other than the National Engineering Laboratory.

IT IS FURTHER ORDERED that the Department of Energy should be, and is hereby, ENJOINED from any further transportation, receipt, processing, and storage of spent nuclear fuel at the Idaho National Engineering Laboratory until the comprehensive environmental impact statement is completed, reviewed, and any challenges to the statement are resolved.

IT IS FURTHER ORDERED that the court shall retain jurisdiction over this case for the purpose of hearing and resolving any dispute between Idaho and the Department of Energy regarding the adequacy of the final environmental impact statement. Thereafter, upon good cause showing, the injunction shall be dissolved. In the interim, this action is hereby ADMINISTRATIVELY TERMINATED. The Clerk of Court shall administratively terminate this action in his

records, without prejudice to the right of the parties to reopen the proceedings for good cause shown, for the entry of any stipulation or order, or for any other purpose required to obtain a final determination of the litigation.