**STATE OF SOUTH CAROLINA ex rel., David M. BEASLEY, Governor of South Carolina, Plaintiff,**

v.

**Hazel R. O'LEARY, Secretary of Energy, and the United States Department of Energy, Defendants,**

and

**Austrian Research Seibersdorf, BR2 Nuclear Reactor of Belgium Hahn–Meitner Institut of Berlin, GDSS Forschungszentrum of Germany, McMaster University Nuclear of Canada, Paul Scherrer Institut of Switzerland, and Risoe National Laboratory of Denmark, Defendant–Intervenors.**

No. 3:96–2264–17.

District Court of United States, D. South Carolina, Columbia Division.

Dec. 30, 1996.

at 314. The parties have not fully addressed the issue of insurance coverage.

Charles Molony Condon, Attorney General of South Carolina, Treva G. Ashworth, Kenneth Paul Woodington, Christie Newman Barrett, Columbia, SC, for plaintiff.

Raymond E. Clark, Assistant United States Attorney, Columbia, SC, Wells D. Burgess, Beverly Sherman Nash, U.S. Department of Justice, Environment and Natural Resources Division, Janine M. Sweeney, U.S. Department of Energy, Washington, DC, William Patrick Donelan, Jr., Howard A. VanDine, III, James Cranston Gray, Jr., Nelson, Mullins, Riley & Scarborough, Columbia, SC, Joseh R. Egan, John W. Lawrence, Egan & Associates, P.C., Washington, DC, Ralph E. Tupper, Davis, Tupper, Grimsley & Seelhoff, L.L.P., Ladson F. Howell, Howell, Gibson and Hughes, P.A., Beaufort, SC, for defendants.

## ORDER

JOSEPH F. ANDERSON, JR., District Judge.

The State of South Carolina brought this action on July 29, 1996 alleging that an Environmental Impact Statement ("EIS") prepared by the Department of Energy does not meet the requirements of the National Environmental Policy Act ("NEPA"). 42 U.S.C. §§ 4321–4361. The disputed EIS addresses shipments of foreign spent nuclear fuel to the Savannah River Site. The State seeks an order requiring the preparation and circulation of a supplemental EIS and an injunction against deposit of spent fuel into the Savannah River Plant's L–Reactor Disassembly Basin until the supplemental EIS is completed.

1. As the caption indicates, numerous foreign reactor operators have intervened in this action to

This matter is presently before the court on Cross Motions for Summary Judgment by all parties.[1] The court heard oral argument on the motions on December 18, 1996 and took the motions under advisement. The court's judgement is explained herein.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

## THE NATIONAL ENVIRONMENTAL POLICY ACT

■ The National Environmental Policy Act, as suggested by its title, is a Congressional declaration of a policy of environmental awareness. 42 U.S.C. § 4331 *et seq.* The Act requires agencies to evaluate and consider effects on the environment prior to undertaking any major federal action. NEPA recognizes that many factors are important in any decision making process, but demands that the environment be included as one of those many factors. *See Calvert Cliffs' Coordinating Committee, Inc. v. U.S. Atomic Energy Comm'n,* 449 F.2d 1109 (D.C.Cir.1971).

■ Because of the procedural nature of NEPA, the judiciary's role is limited to

support the position taken by the United States.

making two determinations. The court may review whether an agency considered the relevant environmental consequences of its actions, and the court may consider if the agency's decisions were arbitrary and capricious. When all significant environmental consequences have been considered by an agency, the court has no choice but to find that the agency's action complies with NEPA's procedural requirements. *See Adler v. Lewis*, 675 F.2d 1085, 1096 (9th Cir.1982). NEPA does not require that "environmentally friendly" results be reached in the decision making process; it only requires that agencies take a "hard look" at the environmental consequences before undertaking a major action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51, 109 S.Ct. 1835, 1845–47, 104 L.Ed.2d 351 (1989); *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). A court must "ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas & Elec. v. Natural Resources Defense Council*, 462 U.S. 87, 97–98, 103 S.Ct. 2246, 2252–53, 76 L.Ed.2d 437 (1983).[2]

■ As stated above, NEPA is a statutory declaration of the policy of the United States. That policy is "to use all practicable means and measures ... to create and maintain conditions under which man and nature can exist in productive harmony." 42 U.S.C. § 4331(a). The court cannot enforce a declaration of policy, that is for the Legislative and Executive branches alone, but it should keep that policy in mind when construing the requirements of NEPA.

It is now well recognized that NEPA has two main goals. First, NEPA is an attempt to force agencies to consider environmental consequences when making decisions. *Baltimore Gas*, 462 U.S. at 97–98, 103 S.Ct. at 2252–53. Second, NEPA is an attempt to ensure that relevant information is available to members of the public.

Agencies comply with NEPA by formulating an Environmental Impact Statement (EIS). 42 U.S.C. § 4332. The purpose of this statement is to "serve as an action-forcing device to insure that the policies and goals defined in the Act" are met by agencies. 40 C.F.R. § 1502.1 (1996). The EIS must "provide full and fair discussion of significant environmental impacts and shall inform the decision makers and the public of reasonable alternatives." *Id.* To serve this purpose, the EIS should be "concise, clear, and to the point." *Id.*

A major thrust of the regulations dealing with Environmental Impact Statements has been to reduce paperwork and the accumulation of extraneous background data in the statements. *Id.* For example, regulations require that usually the main body of an EIS must be less than 150 pages, and proposals of unusual scope or complexity must be less than 300 pages. 40 C.F.R. § 1502.7 (1996). The regulations also allow incorporation of material by reference, but only when the effect is not to impede public review of the action. 40 C.F.R. § 1502.21 (1996).

---

**2.** The United States casts a cloud upon the meaning of this quotation by seeming to interpret it as essentially stating that the court cannot review an agency's substantive decisions under an arbitrary and capricious standard when the EIS is sufficient. (United States Memo in Support of Summary Judgment at 34.) However, NEPA actions are brought pursuant to the Administrative Procedure Act, which specifically gives this court the jurisdiction to review agency decisions under an arbitrary and capricious standard. 5 U.S.C. § 706. Therefore, this court has two types of review in a NEPA action: 1) full review over the procedures required by NEPA, and 2) a more limited review over the actual, substantive decisions made by an agency.

An important distinction must be made between these two basis and levels of review. A possibility exists that an agency could fully comply with NEPA's procedural requirements, yet still fail to satisfy review under the APA. An agency could satisfy the procedural requirements by conducting a complete study and considering all possible alternatives in a proposed project. The EIS could then recommend, and an agency could conceivably choose, an alternative for which no reasonable support exists. This would clearly be an arbitrary or capricious decision and could be overturned by a court.

This conflict over the court's power of review does not affect the analysis in the present case because the State only seeks relief based on the inadequacy of the EIS, not on the basis that the decisions arrived at were arbitrary or capricious.

## FACTS

### I. History

The developments leading up to the present controversy stretch back over several decades. In the 1950's, the United States began what was known as the "Atoms for Peace" program. As part of this program, the United States provided nuclear technology to foreign nations for peaceful applications, in exchange for their promises to forego development of nuclear weapons. A key part of this program was the provision, by the United States, of highly enriched uranium used to fuel research reactors in other countries. The United States also agreed to receive spent fuel after it had been completely used in foreign reactors. This part of the program has sometimes been referred to as the "take back" provision.

In the past, the used fuel elements were transported to the United States, where they were reprocessed to extract the uranium still remaining in the spent fuel. In this way, the United States was able to maintain control over disposition of the enriched uranium that it had provided to other nations. The United States was thus able to keep the spent fuel from being used for illicit purposes.

In 1978, DOE initiated the "Reduced Enrichment for Research and Test Reactors" program in an attempt to further reduce the dangers of nuclear weapons proliferation. Pursuant to this program, the United States has sought to stop foreign nuclear research reactors from using highly enriched uranium, which may readily be used in the construction of nuclear weapons. Instead, the United States began advocating the use, by foreign countries, of low enriched uranium. The ultimate goal of this program is to eliminate the use of highly enriched uranium in civilian programs altogether.

The participation of foreign governments and reactor operators in this program has been based in part on mutual expectations that the United States would continue to accept foreign spent fuel for disposition. The United States accepted highly enriched foreign spent fuel until 1988, and low enriched fuel until 1992. However, the United States has not accepted foreign spent fuel for several years now, with the exception of limited shipments sent to the Savannah River Site as allowed by *South Carolina v. O'Leary*, 64 F.3d 892 (4th Cir.1995). Therefore, in the recent past, nuclear reactors overseas have retained spent fuel elements at their sites.

In July of 1993, Secretary of Energy Hazel O'Leary announced an intention to resume the take-back program as soon as feasible. (O'Leary letter of 7/13/93, State's Ex. 3). The Department of Energy has since then been in the process of developing a plan to begin receiving shipments of this spent fuel once again. That planning, and the decision ultimately reached in the plan, resulted in the present litigation.

Also in 1993, a United States District Court forced the Department of Energy to reevaluate its policy in regards to storing spent nuclear fuel in an Idaho storage facility. *See Public Service Co. of Colorado v. Andrus*, 825 F.Supp. 1483 (D.Idaho 1993). In 1995 under the shadow of this court order, the Department of Energy published an EIS entitled "Department of Energy Programmatic Spent Nuclear Fuel Management and Idaho National Engineering Laboratory Environmental Restoration and Waste Management Programs Final Environmental Impact Statement." The lengthy title of this document gives some indication of the length and complexity of the document itself. For the sake of brevity the court will refer to this document as the "Programmatic EIS."

The Programmatic EIS proposed as one of its alternatives that the Department of Energy "regionalize" its spent nuclear material storage programs. The subsequent Record of Decision adopted this alternative of the Programmatic EIS and regionalized spent nuclear fuel by fuel type. As part of the regionalization plan, the Department of Energy decided that all aluminum clad fuel would be stored at the Savannah River Site. The great majority of spent foreign reactor fuel is aluminum clad; thus the Programmatic EIS and Record of Decision had the potential effect of sending seventy five percent of all foreign spent fuel accepted into the United States to Savannah River. *See* Programmatic EIS ROD at 21.

## II. The EIS Challenged by the State

On October 21, 1993, the Department of Energy published a Notice of Intent to prepare an EIS on a proposed policy for the management of spent foreign reactor fuel. Public comments were solicited at nine public meetings held in November and December 1993. Ultimately, the Department received more than 2,200 comments from 493 commenters. ROD at 3. The Governor of South Carolina filed two letters that commented on the scope and alternatives of the EIS. On December 14, 1993, Secretary O'Leary responded to the Governor's comments and explained that the Department was implementing some of the Governor's suggestions. A.R. No. I.31.

On April 21, 1995, the Department made a draft EIS available to the public. Two weeks prior to that date, the Department sent a copy of the draft EIS directly to the Governor of South Carolina. A.R. No. I.163. Over the following months, approximately 900 people attended seventeen public hearings held around the country, and more than 5,000 written comments were received. ROD at 4. The Governor of South Carolina provided additional written comments on June 20, 1995. A.R. No. I.263.

In his letter, the Governor identified two concerns. First, he urged the Department to limit the amount of fuel considered in the EIS, and give consideration to alternatives besides bringing the spent fuel into the United States. Second, he urged that the EIS sanction chemical separation as the preferred method of managing the spent fuel.

The process of planning for the storage of the spent fuel is embodied in the "Final Environmental Impact Statement on a Proposed Nuclear Weapons Nonproliferation Policy Concerning Foreign Research Reactor Spent Nuclear Fuel." This document is the EIS that the State challenges in the present proceedings. This EIS purports to evaluate several alternative policies for dealing with the foreign spent fuel.

The EIS in question sets out three broad alternatives for controlling the foreign spent fuel. Alternative one is for the United States to accept the spent fuel from foreign nations and manage it in the United States. Alternative two is to provide assistance to foreign nations in storing or reprocessing their spent fuel. Alternative three is a combination of both one and two and involves managing some spent fuel in the United States and some abroad. These were the three broad alternatives the Department of Energy listed as choices of action. The alternative of doing nothing was also considered. Under alternative one, several different sub-alternatives exist.

The sub-alternatives deal with where and how the foreign fuel will be managed in the United States. Factors considered included financing, fuel amounts, transportation, storage technology, duration of storage, and treatment of the fuel. Several sites were supposedly considered for storage of the spent fuel. They were the Savannah River Site, the Idaho National Engineering Laboratory, the Hanford Site, the Oak Ridge Reservation, and the Nevada Test Site. EIS at 2–11, 2–12. Only the Savannah River Site and the Idaho Site could have possibly begun receiving waste on an expedited basis. *Id.*

On May 13, 1996, the Department of Energy formally decided on how to manage the foreign spent nuclear fuel. The Record of Decision states that around 18,000 spent nuclear fuel elements will be accepted by the United States and stored at the Savannah River Site. ROD at 18. Shipments bound for the site will be received at the Charleston Naval Weapons Station and transported by truck or rail to the site. The fuel rods will be stored in the Receiving Basin for Offsite Fuel[3] ("RBOF") and in the L–Reactor Disassembly Basin ("L–Basin"): both are wet storage facilities. The bulk of the fuel would be kept in the L–Basin.

After a period of storage in existing wet storage facilities, the Department of Energy speculates that the spent fuel will be treated or packaged as necessary to prepare it for transportation to an unknown final repository. ROD at 12. To accomplish these goals, the Department has promised to develop and demonstrate by the year 2000 a new treat-

---

**3.** The State has dropped its challenge to the EIS's analysis of the RBOF facility.

ment technology that would allow the spent fuel to be disposed of. If this new technology should not become available by 2000, the Department indicates that it will consider other methods of treatment such as chemical separation. *Id.* The Department has invited the State of South Carolina to participate in developing these new treatments. Finally, the Department has committed itself to studying and promulgating a new Record of Decision prior to the year 2000 to explain to the public what will happen to the fuel rods then being stored at the site.

## DISCUSSION

Prior to discussing the findings of the court, it would be helpful to review the State's burden in this case. This court's review over the procedures required by NEPA is limited to determining whether the Department of Energy took a "hard look" at the environmental consequences of its proposed actions and considered other alternatives. *Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). This is an extremely narrow review.

Although the goals and policy of NEPA are important, the court cannot enforce them independently of the legal test, which simply requires an agency to take a "hard look" at environmental consequences. An agency may take a hard look at environmental consequences, thus meeting the technical, legal requirements of NEPA, and yet the broader goals of NEPA may still not be met.

At its heart, NEPA is intended to encourage decision making subjectively influenced by environmental considerations; however, the court is not empowered by the legislation to enforce that goal itself. The court can only apply the legal tests Congress and the Supreme Court have enunciated in an effort to further the broad policy statements set out in NEPA.

## I. Length and Complexity of the EIS

The State raises several challenges to the sufficiency of the EIS. The first issue it raises relates to the length and complexity of

the EIS. The State claims that this EIS is so lengthy and convoluted that it fails to properly inform the public of the nature and consequences of the decisions being made. In this respect, the State argues, the EIS does not make full disclosure to the public. The State believes that the Department of Energy placed within the EIS lengthy discussions of matters not seriously under consideration, already decided against, and not ripe for decision. Furthermore, the State claims that some of the language, especially discussing accident risks, is unintelligible to the public at large and thus fails to adequately inform the public.

The State is correct that one of the main goals of NEPA is to inform the public of the consequences of proposed actions. To this end, the regulations governing NEPA have recognized that clarity and brevity is of great importance. Regulations state that the main body of a complex EIS should be no more than 300 pages. The body of the EIS under question is over 400 pages.[4] This number does not sound too extreme given the complexity of the undertaking. However, a closer examination of this EIS shows that the issue is a little more complicated.

This EIS contains not only the main volume, but also eight volumes listed as "appendices" and multiple documents incorporated by reference. The regulations specifically recognize the legitimacy of using appendices. Appendices are to be those analytical documents which support the conclusions laid out in the main body of an EIS. 40 C.F.R. § 1502.18 (1996). The statistical studies on accident risks are a good example of technical analysis that is legitimately included in an appendix. EIS F251–64 However, at least some of the appendices in the EIS are more similar to material that should probably be in the main body. In other words, some of the material contained in "appendices" should probably be contained in the main body of the EIS.

The nature of at least some of the appendices is revealed through the arguments that have been made to the court. In arguing

---

**4.** The body or "text" of an EIS is considered to begin after the table of contents and end prior to the listing of preparers. 40 C.F.R. sections 1502.7 & 1502.10.

that the EIS has adequately considered all safety problems, the United States has repeatedly relied upon the appendices. This reliance demonstrates the basic importance of parts of the appendices to the EIS.

Appendix F contains particularly important information about which the public should be informed. In Appendix F, a reader finds some of the EIS's discussions regarding the physical characteristics and weaknesses of the L–Basin and the RBOF facilities. EIS F100–108. Importantly, in Appendix F the Department discloses that the L–Basin was not intended for long term storage of spent fuel and that upgrades would be necessary to make it fit for this purpose. F35–39. Major vulnerabilities of the L–Basin are also discussed in Appendix F, such as insufficient training, inadequate tornado protection, and lack of seismic protection. F105. Various other matters dealing with the safety of the L–Basin are sprinkled throughout Appendix F.

The main body of the EIS does alert the reader that some of these important discussions are contained in the Appendices. This referencing negates any prejudice that the public could otherwise have suffered; however, it does not negate the fact that the appendices contain important information basic to the EIS. Considering this, the court has reached the conclusion that in essence the body of the EIS consists of nine volumes, thousands of pages long. This conclusion must be reached because a reader would have to dig though all volumes to learn important, basic information.

In determining the length of the EIS, the court has not even considered the numerous cross-references to many other documents (the State claims the total page number of the EIS, including cross referenced documents, is over 20,000). Cross referencing is specifically allowed by the regulations, but only to ease difficulty in understanding the document.

Although the goal of easy public access to important information has not been fulfilled to the greatest extent possible, the court does not believe that this failure makes the EIS inadequate under the law. In other words, the EIS could be more clear and concise, but is not so unclear that the public did not have notice of the important facts. Especially relevant to the court's determination that the public has been adequately informed is evidence of a lengthy and intensive series of public hearings.

As discussed above, many hearings were conducted throughout the planning stages and included comments from various groups concerned about storage at the Savannah River Plant. These hearings addressed many of the concerns interested citizens had with the proposed project. *See generally* ROD at 15–19. Among the public comments received and responded to were concerns over seismic monitoring, leak detection, and water quality in the L–Basin. EIS, Volume 3, 2.5—205–06. These are some of the very issues the State claims the EIS did not adequately notify the public about. Governor Beasely was among those concerned citizens who commented on the project. ROD at 15. These types of hearings and comments, coupled with an extensive EIS that covers most significant areas (albeit in an overly lengthy manner), meet the burden of public disclosure required by NEPA.

■ The State also argues that the EIS failed to notify the public that the L–Basin would be the facility used to house the spent fuel. This argument is not supported by the evidence. The EIS discusses the use of the L–Basin in several places. EIS 2–64, 2–66, & F123. This discussion was adequate to give notice to the public that the L–Basin was proposed to be used for storage of foreign spent fuel. Proof that the discussions were adequate for public notice can be garnered from the public comments specifically referencing the proposal to use the L–Basin for storage.

## II.  Post hoc rationalization

■ The State's next broad objection is that the EIS was simply an exercise in *post hoc* rationalization. The State contends that the EIS was done only to justify the already-chosen option of bringing the fuel rods into the United States. South Carolina believes that the four broad alternatives listed by the Department in the EIS were a farce, with

only the first option ever being realistically considered. The State may well be correct in its position that only one option was ever seriously considered by the Department. *See* Letter of 7/13/93 from Secretary Hazel O'Leary to Secretary Warren Christopher (stating that acceptance of foreign spent fuel would begin as soon as feasible).

The decision to store the spent fuel at the Savannah River Site's L–Basin may also have been a foregone conclusion.[5] The parties do not dispute that the Programmatic EIS, completed in 1995 under a court order in Idaho, decided that all aluminum-clad spent fuel would go to the Savannah Site, and that the great majority of foreign spent fuel is aluminum clad. Internal documents make it clear that officials at the Savannah River Site were under the impression that the L–Basin would be used as the recipient of the spent fuel. *See* State's Exhibit 6 & 8 (SRS internal memos from 1994 & 1995 discussing wet storage of foreign spent fuel).

If the State's contentions are correct, the goal of environmentally influenced, subjective decision making was not achieved in this case. Perhaps nothing revealed in an EIS would have changed the Department's desire to bring the fuel back into the United States. As discussed above, however, the court can only conduct a narrow review of whether the procedural requirements of NEPA were followed. In this case, the Department did comply with the literal requirements of NEPA. The Department took a hard look at all environmental consequences prior to undertaking the proposed action, and that is all NEPA requires.

### III. Safety Concerns

■■■ The EIS studied the effects of storing the spent fuel in the L–Basin for a ten year period (what is generally referred to in the papers as "the near term"). The EIS then recommended changing storage techniques during an "interim term." The interim period is a stage between the near term

but prior to "final disposition." Management techniques during the interim period and during final disposition are not discussed with specificity in the EIS. In fact, the Department does not know with precision what will happen to the spent fuel. Therefore, another EIS will have to be done after a ten year period to determine what major action or inaction will be undertaken. Toward this end, the EIS recommended (and the Department decided upon) acceleration of the ten year, near term schedule. The Department of Energy has committed to reaching a new Record of Decision prior to the year 2000. ROD at 19.

The State argues that the EIS failed to discuss numerous safety concerns with the L–Basin that were identified elsewhere by government agencies. Specifically, the State cites the report of the Spent Fuel Working Group, a committee chartered by the Department of Energy in 1993 to assess the vulnerabilities of its nuclear storage facilities. Administrative Record, Item 4. The Working Group recognized that the L–Basin was among five Department facilities with "significant vulnerabilities." Vol. I at 11, 12.

The State also cites findings by the Defense Nuclear Facilities Safety Board ("DNFSB"), a safety board created by Congress that comments on the Department of Energy's nuclear policies. Among other concerns, the DNFSB was worried about the L–Basin's inability to meet current earthquake designs, corrosion of existing nuclear material already in the basin, lack of adequate leak detection system, and lack of high efficiency ventilation systems. (DNFSB Technical Report 7, at 8–9 11/1/95, Attachment C to State's Memo Supporting Preliminary Injunction.) The State further relies on the Department's "Plan of Action to Resolve Spent Fuel Vulnerabilities," published in February of 1994. Administrative Record, Item 4. This plan states that all spent fuel and targets should be removed from the L–Basin by 1999.

---

5. Some evidence exists that resources may have been committed to this project prior to an EIS being completed. State's Ex. 8 at 3. Commission of resources prior to a ROD is expressly prohibited if it would tend to prejudice selection of alternatives. 40 C.F.R. § 1502.2(f). However, from the meager record on this point, the court determines that this commission of resources was probably not substantial enough to prejudice the selection of alternatives.

As further evidence of the inability of the L–Basin to safely hold spent fuel, the State cites a report of the Westinghouse Savannah River Company. State's Ex. 11. Westinghouse operates the Savannah River Site for the Department. This document states that none of the facilities it discusses, including the. L–Basin, could qualify for future wet storage of Spent Fuel without dispensation from all Department safety standards. *Id.* at 4. The report considered the greatest problem to be vulnerabilities to earthquakes and lack of double hull containment and leak detection. The State also draws the court's attention to a Westinghouse report stating that "true leak detection is not attainable" in the L–Basin. State's Ex. 12 at 123; *see also* State's Ex. 12a. Another memo stated that long term underwater storage of aluminum fuels is not desirable because of the potential for corrosion. State's Ex. 15 at 11.

The State contends that the EIS ignores these concerns about the L–Basin that have been documented in the past. The State argues that the only mention of safety problems is on page 2–64 of the EIS where it is stated that the L–Basin is not currently configured to store the reactors but will be updated with new storage racks, new equipment, new safety documentation, and new upgrades addressing water quality. The State also recognizes that the EIS also briefly mentions the geologic and meteorological weaknesses of the basins.

The State correctly asserts that all of the problems they point to with the L–Basin have been identified in the past by the Department or other entities. However, the State misunderstands the burden the Department faces in formulating the EIS. The Department does not have to solve, in the EIS, the problems that exist at the L–Basin. The Department is only required to recognize those problems when reaching its decision. The EIS meets this burden. Furthermore, the Department contends that it has solved many of the problems pointed out by the State.

In making its risk analysis in the EIS, the Department evaluated the risks under worst case scenarios and found them to be acceptable. In other words, the Department entered into its decision by looking at the L–Basin as if no further repair and improvements would occur, and looked at the possible hazards as if the worst would occur. The EIS thus used a "bounding" analysis to make sure that the proposed actions were viewed in a worst case scenario. EIS F252 *et seq.* Bounding means that the EIS by implication considers lesser risks when it looks at greater risks.

Hazards such as human error, equipment failure, and natural disaster were all considered. *Id.* A pool breach is also expressly understood to be a remote possibility. EIS F251–52. It is not necessary for the Department to recognize each individual study in the past that pointed out various vulnerabilities. It is enough that the EIS considers the vulnerabilities, and the ultimate decisions are made with an understanding that those vulnerabilities exist. Furthermore, the Department has committed itself to making improvements in both the L–Basin and the RBOF facilities. The State is simply wrong in its argument that the EIS does not consider all reasonably possible vulnerabilities of the L–Basin.

## CONCLUSION

The Department of Energy took the required "hard look" at the environmental consequences of its actions, as well as the possible alternatives, as required by NEPA. The Department fairly disclosed to the public the hazards and conditions of bringing foreign spent fuel into the United States and storing foreign spent fuel in the Savannah River Site's L–Basin.

As noted at the outset of this opinion, in enacting NEPA Congress has provided a very narrow scope of judicial review over Environmental Impact Statements. In this case, the court may only concern itself with the question of whether the environmental consequences of the Department's decision were sufficiently evaluated, and whether the public and decision makers were sufficiently informed of the reasonable alternatives. This was done. That being so, this court's inquiry must end. As the Fourth Circuit has observed, "The courts which administer our system of laws are not always at liberty to

pursue their own ideals of justice." *Wilson v. Lyng*, 856 F.2d 630, 636 (4th Cir.1988).[6]

The court cannot force the Department to chose the alternative that the court would have chosen. For these, reasons, the court is constrained to deny the State's requests for supplementation of the Environmental Impact Statement and for injunctive relief. Defendants' motions for summary judgment are granted; plaintiff's motion is denied; and this action is dismissed.

IT IS SO ORDERED.

---

6. As Justice Stevens noted in dissent in *Boyle v. United Technologies*, "The selection of that policy which is most advantageous to the whole involves a host of considerations that must be weighed and appraised. That function is more appropriately for those who write the laws, rather than for those who interpret them." *Boyle v. United Technologies*, 487 U.S. 500, 532, 108 S.Ct. 2510, 2529, 101 L.Ed.2d 442 (1988) (Stevens J., dissenting), *quoting United States v. Gilman*, 347 U.S. 507, 511–13, 74 S.Ct. 695, 697–98, 98 L.Ed. 898 (1954).